Cite as 2024 Ark. App. 435

# ARKANSAS COURT OF APPEALS

DIVISION II
NO. CV-22-152

|  |  |  |
|---|---|---|
| | | **Opinion Delivered** September 18, 2024 |
| ANGELA STYLES | | |
| | APPELLANT | APPEAL FROM THE POPE COUNTY CIRCUIT COURT [NO. 58DR-18-53] |
| V. | | |
| | | HONORABLE GORDON W. "MACK" MCCAIN, JR., JUDGE |
| JAMES STYLES | | |
| | APPELLEE | AFFIRMED IN PART; REVERSED IN PART; REVERSED AND REMANDED IN PART; DISMISSED IN PART |

**KENNETH S. HIXSON, Judge**

This is a divorce case. Appellant Angela Styles and appellee James (Jamey) Styles were divorced by a decree entered on February 10, 2020. The trial court noted in the divorce decree that the decree was not a final order because numerous issues remained undecided, and a final order was entered on July 27, 2021, that decided the issue of child custody and the other issues relevant to this appeal. Among other provisions, the July 27, 2021, order awarded Jamey custody of the parties' four minor children subject to Angela's visitation and ordered Angela to pay child support. On August 24, 2021, the trial court entered an order awarding Jamey attorney's fees and costs of $54,737.52. Angela timely appealed from both the final order and the order awarding attorney's fees.

Angela raises eight arguments on appeal. Angela argues that (1) the trial court erred in awarding custody of the children to Jamey; (2) the trial court erred in limiting Angela's visitation; (3) three contempt findings were erroneous; (4) the award of child support going forward was erroneous; (5) the award of back child support was erroneous; (6) the trial court erred in requiring Angela to pay half of the private-school expenses Jamey incurred; (7) the restrictions on the children's relationship with Angela's twin sister, Andrea Chrisman, was erroneous; and (8) the attorney-fee order was erroneous. For the reasons explained herein, we affirm in part; reverse in part; reverse and remand in part; and dismiss in part.

## I. *Standard of Review*

Our standard of review in domestic-relations cases is well settled. This court reviews domestic-relations cases de novo, but we will not reverse the trial court's findings unless they are clearly erroneous. *Doss v. Doss*, 2018 Ark. App. 487, 561 S.W.3d 348. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* Due deference is given to the trial court's superior position to determine the credibility of witnesses and the weight to be given their testimony. *Id.* As to issues of law, however, we give no deference to the trial court; rather, we review issues of law de novo. *Hargrove v. Hargrove*, 2015 Ark. App. 45, 453 S.W.3d 683.

## II. *Facts and Procedural History*

Angela and Jamey were married in 1985. The parties have five children: Silas, born in 2000;[1] MC1, a girl born in 2003; MC2, a girl born in 2005; MC3, a girl born in 2011; and MC4, a boy born in 2011. During the marriage, the parties lived with their children in a house in Coal Hill, and they also had a nearby farm. Angela is a dermatologist with her own clinic, and Jamey is a farmer. All the children were home schooled, primarily by Angela, during the marriage.

The parties' relationship began to deteriorate over the years and became particularly contentious around 2014. In February 2017, the parties separated; Jamey moved out of the marital home and into a vacant employee-housing cabin on the family farm. For the next year, the children lived with Angela in the marital home while Jamey maintained contact with the children.

On February 5, 2018, Jamey filed a complaint for divorce alleging general indignities as grounds, and in his complaint, Jamey asked to be awarded custody of the children.[2] At the time Jamey filed for divorce, he had moved from the cabin on the family farm to a house in Russellville. Contemporaneous with his divorce complaint, Jamey also filed a motion for

---

[1]Although Silas was a minor when Jamey filed for divorce, he was an adult at the time of the parties' divorce and when the final order was entered. The other four children were still minors at the time of the final order.

[2]Although Angela contested the grounds of general indignities, Jamey later filed an amended complaint for divorce on July 23, 2019, adding the ground that the parties had lived separate and apart in excess of eighteen months. In Angela's answer to the amended complaint, she admitted that the parties had lived separate and apart in excess of eighteen months, but she denied that Jamey should be awarded custody of the children. Grounds for divorce are not at issue in this appeal.

emergency custody. In that motion, Jamey alleged that Angela had suffered extreme mental-health problems over the last two years that resulted in two suspensions of her medical license in March 2016 and again in April 2017. Jamey further alleged that Angela had been acting irrationally in front of the children. He cited numerous examples, including her being vocal about her belief in the spiritual world of demons and witches. On February 5, 2018, the trial court entered an ex parte order granting Jamey emergency custody of the children, and a temporary hearing was scheduled for February 8, 2018.

After the February 8, 2018, temporary hearing, the trial court entered an order on March 26, 2018, that awarded temporary custody of the children to Jamey and permitted him to enroll the children in the Community Christian School in Russellville. Angela was awarded standard visitation, which included visitation with the children every other weekend and on holidays. In the temporary order, the trial court encouraged and approved of the parties agreeing to additional visitation and encouraged the parties to be flexible with visitation. The trial court appointed an attorney ad litem and ordered the parties to cooperate with the ad litem. The temporary order also enjoined the parties from talking negatively about the other party or their family in the presence of the children and enjoined the parties from harassing, molesting, or vilifying the other party.

On June 19, 2018, Jamey filed a motion for contempt and for other relief. In this motion, Jamey alleged that Angela had engaged in contemptuous conduct by making derogatory remarks about him in front of the children, including that she did not trust him with the children and she was afraid he would hurt them. Jamey also asked for an injunction

4

enjoining Angela from allowing the children contact with Angela's twin sister, Andrea Chrisman, alleging that Andrea—in the presence of the children—had called Jamey's sister the devil and said that his sister was a witch and controls other people's minds. Finally, in this motion, Jamey also asked for temporary child support retroactive to when he received custody of the children in February 2018.

On October 26, 2018, the trial court entered a second temporary order that modified Angela's visitation with the children. In addition to the previously awarded weekend visitation, Angela was awarded visitation during the school year on Mondays, Wednesdays, and Thursdays from the time school let out until 9:00 p.m.

On November 6, 2018, Jamey filed another petition for contempt against Angela, alleging that Angela had violated the trial court's order prohibiting each party from harassing the other party. Jamey alleged that Angela had sent him harassing text messages first regarding the parties' property and then regarding the school the children were attending.

On December 20, 2018, Angela filed a motion to exclude evidence from the Arkansas State Medical Board relevant to the proceedings that had resulted in the previous suspensions of her medical license. In her motion, Angela noted that the ultimate outcome of those proceedings was the reinstatement of her license, and she argued that the psychological testing and opinions generated therein regarding her mental health were for the limited purpose of those proceedings and should not be admitted in the divorce case. On December 28, 2018, Jamey filed a response to Angela's motion in limine, stating that

Angela's mental state was at issue in the divorce proceedings and that her motion in limine should be denied.

On March 1, 2019, the trial court entered an order appointing Dr. Glen Adams to perform psychological evaluations on both parties. On April 15, 2019, the trial court entered an order denying Angela's motion to exclude evidence from the Arkansas State Medical Board relevant to the proceedings involving the suspensions and subsequent reinstatement of her medical license.

A contempt hearing was held, and on May 10, 2019, the trial court entered an order finding Angela in contempt. Based on evidence at the contempt hearing that Angela had argued extensively with Jamey in front of one or more of the children while they were in a church gymnasium—while Jamey was admonishing her to stop—the trial court found that this was "uncalled for continued communication around . . . these children in a public place" and that "it appears there is an extreme controlling nature on the part of the mother." The trial court further found that "the evidence is clear . . . that there is an overbearing nature of the mother, that when she is around these children she incites them, she tries to control them, [and] she directs their behavior," which resulted in the children telling Jamey that he had abandoned them. The trial court found that Angela had willfully refused to adhere to the court's orders, and for the contempt it sentenced her to thirty days in the county detention center, suspended on the condition there be no further violations of the court's orders. The trial court also ordered Angela to pay Jamey's attorney's fees with regard to the matter and, in a separate order, awarded Jamey $2250 in attorney's fees.

6

Although there were many hearings conducted in this case, the most significant hearings were held over four days between July 30 and August 7, 2019. Both parties and numerous other witnesses testified at these hearings. A summary of the relevant testimony follows.

Angela testified that her desire was to have her husband back at home, but that if a divorce was granted, she wanted primary custody of the children. She stated that before Jamey filed for divorce, the children had been home schooled all their lives and that she wanted to resume home schooling them. Angela also testified that if the trial court did not grant her primary custody, in the alternative, she wanted joint custody[3] and stated that if joint custody was awarded, she was willing to cooperate with Jamey in raising their children. Angela denied that she created an environment around her children that discouraged them from loving their father.

Angela testified that during the marriage, there were altercations between the parties in which Jamey became violent, which escalated beginning in 2016. Angela testified that during some of these altercations, Jamey had caused bruises on her, and she introduced photographs showing bruises on her arm and foot. Angela also testified that there were incidents when Jamey had become violent with the children. Angela acknowledged that she never filed a police report regarding any incident involving her or the children. However,

---

[3]In her pleadings below, Angela requested only primary custody of the children. Moreover, in her argument on appeal pertaining to custody, she argues only that she should have been awarded primary custody and does not argue in the alternative that joint custody should have been awarded.

there had been investigations by the Arkansas Department of Human Services (DHS), one of which resulted in a true finding of abuse against Jamey for slapping MC3 on the leg, but that finding was later reversed.

Angela also discussed the temporary suspensions of her medical license, which occurred in March 2016 and April 2017. These proceedings involving the Arkansas State Medical Board had been initiated by Jamey when he contacted the Board expressing concerns over Angela's mental health. Angela testified that her license was reinstated, and the proceedings before the Board were dismissed in February 2019, although upon dismissal, she voluntarily agreed to see a psychiatrist, Dr. Richard Sundermann, every three months.

Angela also testified about the time she had spent with children since the children were placed in Jamey's custody in February 2018. Angela testified that the parties voluntarily deviated from the temporary visitation awarded by the trial court, that she exercised more visitation than had been awarded, and that during the school year, the children "spent over sixty percent of their waking hours, apart from the time they were in school," with her. Angela stated further that the children spent most of the summers with her.

Jamey testified that when he contacted the Arkansas State Medical Board about Angela during their marriage, he did so because she had been engaging in bizarre behavior, he was concerned about her mental health, and he was trying to get her some help. Jamey gave examples of Angela's behavior that concerned him during the latter part of their marriage. Jamey stated that that Angela would dance around singing that his sisters were Satan in the flesh to a tune in hopes that the children would remember it. Angela had also

8

accused Jamey's sisters of murdering their mother and accused one of them of being a witch. On another occasion Angela accused Jamey, in front of the children, of having sexual relations with a puppy. According to Jamey, Angela accused a woman of stealing three inches of MC1's height to pass it on to her children. Jamey stated that Angela spoke often about the spiritual world of demons and witches and that Angela had withheld medicine from the children saying that prayer would heal them.

Jamey testified that, after he separated from Angela in February 2018 and moved to the employee-housing cabin on their farm, Angela would visit him often and would bring the children there and tell him he needed to come home. On dozens of occasions, Angela beat on the windows and doors screaming and hollering, once stating, "I'll see you are broke and destitute." Jamey stated that on another occasion Angela had taken everything out of the cabin and had thrown his mattress in a horse trough filled with water. Due to Angela's erratic behavior, Jamey would sometimes hide in the closet or the bathroom when she came to see him. Jamey stated that during this time, he visited the children at the marital home on a regular basis. Jamey stated that due to Angela's continuous harassment of him at their farm cabin, he decided to move from there into a house in Russellville, and at the same time, he filed for divorce.

Jamey acknowledged that there was DHS involvement regarding the children, but he denied abusing them. He stated that he slapped MC3's leg because she was telling him that she does not have to listen to him and that he is not her father. Jamey admitted that he hit MC3 harder than he had intended because it left a handprint, but he stated that by the next

9

morning there we no marks on her leg. Jamey also acknowledged that, after he filed for divorce and was awarded temporary custody of the children, he initiated a Family in Need of Services (FINS) petition with respect to two of the children, but he explained that he did so only because the children were misbehaving and refusing to turn in their homework. With respect to his alleged violence toward Angela, Jamey stated that he once grabbed her by the shoulder when she was saying horrible things about him, and that on another occasion, he accidentally stepped on her foot when he was trying to get away.

Jamey stated that since he has had temporary custody of the children, they have been defiant toward him and that he believes that this is under the direction of Angela. Jamey stated that on one occasion, he was driving with the children in his car, and the children were being "totally belligerent" and were throwing things at him and calling him names. Jamey stated that his children had told him he should just commit suicide and had also told him to watch out when he goes to sleep. Jamey's children had called him Hitler and said, "Hitler must die," and had told him he was going to hell for getting a divorce.

Jamey stated that on one occasion the children ransacked his house in Russellville, turning over the furniture, knocking things off the walls, and putting shampoo and laundry detergent on the floors. According to Jamey, after this occurred, MC4 stated, "Yeah, we are supposed to treat dad as bad as we can." The other children overheard this and admonished him, "MC4." MC4 then told Jamey, "I didn't mean to say that."

Jamey testified that the children would berate him in Angela's presence and that Angela would encourage them to do so. Jamey testified:

> They (the children) were on a mandate that they were supposed to treat me as bad as possible and they did their best to do it. Their goal was and they would tell me, 'we are gonna treat you so bad you are gonna let us go back to mom.' . . . [T]he kids have been told several times that I have abandoned them, by their mom, because I couldn't live in that situation any longer. And after I got out of that situation, I realized they don't need to be living in that situation.

Jamey testified that he thought that Angela had "poisoned" the children against him.

Jamey also testified about Angela's twin sister, Andrea, with respect to his request that the children have no contact with her. Jamey stated that both Angela and Andrea had prayed, in front of the children, for a spirit of confusion to come upon one of Jamey's sisters and her family. Jamey also stated that Andrea has bizarre beliefs about his family, including that his sister is a witch and controlled Andrea's mind, and that he does not want his children around these beliefs.

Jamey stated that the children did not want to attend private school because they have been told it is terrible. However, he stated that despite their claimed aversion to their school, they all did very well in school and that he wanted them to continue to attend private school.

Jamey indicated that since these proceedings began, his communication with Angela regarding the children has been strained, and he described their level of cooperation as hostile. However, during the pendency of the case, the trial court ordered the parties' communications to be limited to texting, which Jamey said "has helped a lot."

Angela's sister, Andrea Chrisman, testified that she formerly worked at Angela's dermatology clinic, and she acknowledged engaging in some unusual behavior at the clinic, where the parties' children were frequent visitors. As a result of the proceedings involving

11

Angela before the Arkansas State Medical Board, the Board ordered that Andrea could no longer work at the clinic.

Velda Bean is a former employee at Angela's clinic who had worked there with Andrea. Velda testified that on one occasion at the clinic, Andrea put a Walmart sack on her head and stated that she had to wear it to keep the sex witches away. Velda had also heard Andrea call one of Jamey's sisters, Jan Storms, a witch.

Jan Storms is also a former employee at Angela's clinic who had worked there with Andrea, and Jan testified that Andrea had told her she had demons. Jan quit working at the clinic after Angela told her she was filled with demons and spirits and called her a witch. Jan stated that she was once very close to the parties' children but that the children now treat her like a stranger. Jamey's other sister, Joy Wilson, similarly testified that her relationship with the parties' children had been lost.

Dr. Glen Adams was appointed to perform psychological evaluations on the parties, and he testified about his findings. With respect to Angela, Dr. Adams' diagnostic impression was unspecified personality disorder and adjustment disorder with mild anxiety. Dr. Adams made no diagnosis for Jamey, although he did note mild defensiveness on two of the tests and reported that it is likely that his anger can escalate quickly when challenged.

Dr. Richard Sundermann, a psychiatrist, testified that he began seeing Angela in April 2017 in connection with her proceedings before the Arkansas State Medical Board and that he continues to see her every three months. Dr. Sundermann opined that Angela does not suffer from any psychiatric illness. He testified that the statements Angela made about

demons were not due to irrational thinking or a psychiatric illness but were the result of very fundamental religious upbringing combined with marital stress. Dr. Sundermann found no psychiatric reason to question Angela's parenting.

Donnie Baker has been friends with both parties for many years. Donnie testified that he was at Jamey's house after the children had ransacked it. Donnie stated that the children were very angry and disrespectful toward Jamey, telling him that he was the devil and they hated him. On another occasion, Donnie was riding with Jamey and the children in a vehicle while the children constantly insulted Jamey, telling him that he had abandoned them, that they did not have to obey him, and that he is not their dad. According to Donnie, the children read scriptures to Jamey and told him it was his fault for separating the family, and one of the children told Jamey it was probably best that he kill himself. Donnie stated that the youngest child, MC4, misbehaved and then told Jamey, "That's what we are supposed to do," before realizing he was not supposed to say that. Donnie stated he could tell this from MC4's facial expression.

Silas Styles, the parties' oldest child, was eighteen when he testified at the hearing. Silas testified that after Jamey was awarded temporary custody of the children, they spent most weekends at their mother's house and stayed with their mother frequently during the summer. Silas stated that when he turned eighteen, he moved out of his father's house and resumed living with his mother. According to Silas, Jamey had told him that he moved out "because I'm punishing your mom." Silas stated that he had very little respect for his father after that. Silas indicated that none of the children wanted to live with their father and that

there was an environment of disrespect toward him while living in his house. He acknowledged that the children called their father an idiot and a jerk and "Hitler all the time." Silas denied telling his father to commit suicide and explained that what he did say was that it would have been better if he had committed suicide a long time ago "so we wouldn't have to mess with all this trauma."

MC1, the parties' oldest daughter, was fifteen when she testified at the hearing. MC1 stated that during the one-year period between when Jamey left the marital home and filed for divorce, she and her siblings lived with their mother, and Jamey was not around and did not attend church or the children's activities. MC1 described her relationship with her father as "real bad" beginning when he "took us away." She also stated that "he won't talk to me or my sisters." MC1 indicated that there was a general disrespect between her father and the children, and she admitted that they had turned over furniture in his house but denied that they had destroyed anything. MC1 stated that she is making good grades in private school but that she and her siblings would rather be home schooled. MC1 further testified:

> I want to live with my mom to actually have a home. This has been going on for four or five years now and this isn't the best to happen. He has been trying to call my mom crazy for a long time and I don't know where he came up with that, but he always tells us mom is crazy and he would say stuff like that. And I'm like, 'Hey, dad, she's not crazy.' And I don't think he cares about us.

After the conclusion of the four-day hearing, on August 24, 2019, the children's attorney ad litem issued a report containing his recommendations. In the report, the attorney ad litem expressed the following concerns and opinions:

14

Regardless of the diagnoses, or lack thereof, it is apparent that Angela's behavior has influenced and affected her children's behavior. She has repeatedly involved the children in matters that are strictly adult, parental matters, which should not be fostered upon the parties' children, seemingly without regard for the psychological well-being of the children, especially concerning their relationship with their father.

To his detriment, Jamey has fostered the children's behavior to some degree by moving out of the Coal Hill marital residence in February 2017 and moving into the farmhouse on the same property next to the Arkansas River. Angela had daily contact while the children lived almost exclusively with her for approximately the next year, while Jamey had sporadic contact during that same time. Angela has had ample opportunity to instill in the children a dislike of their father and his life choices.

All the minor children will today state that they all want to be in the custody of and live with their mother, that they do not want to attend Valley Christian School, and that they do not want to have anything to do with Jamey. While I express their desires, I do not believe that it is in the minor children's best interest to allow the minor children to make parental decisions concerning their welfare.

The attorney ad litem recommended that Jamey be awarded sole custody of the children and stated that joint custody is not appropriate because the parties obviously do not get along with each other well enough for joint custody to work. The attorney ad litem recommended that Angela be awarded standard visitation in addition to overnight visitation every Wednesday. The attorney ad litem recommended that the parties continue to communicate through text message only. The attorney ad litem recommended that the children have no contact with Andrea Chrisman unless supervised by someone other than a person related to the children. Finally, the attorney ad litem recommended that the children be allowed to continue to attend the Church of Christ in Clarksville.

On January 7, 2020, the trial court, for the first time in the proceedings, entered an order awarding temporary child support to Jamey. In that order, Angela was ordered to pay $4850 in temporary monthly child support beginning on November 22, 2019.

On February 10, 2020, the trial court entered a divorce decree granting Jamey a divorce based on eighteen months' separation. The divorce decree, however, did not resolve the custody issue or any other issues in the case. The decree stated that it was not a final order and that there would be a subsequent order regarding the final disposition of custody and the division of the parties' real and personal property. Thereafter, hearings involving the parties' property were held, but those hearings are not relevant to this appeal because there is no issue on appeal regarding the disposition of the parties' property.

On July 8, 2020, Angela filed a motion to modify the temporary child support. In her motion, Angela noted that Administrative Order No. 10 had been recently revised and that the newly adopted Income Shares Model was to be used for all support orders entered after June 30, 2020. Angela asked that child support be reset using the new guidelines.

On May 25, 2021, Jamey filed a motion for attorney's fees, noting that there had not yet been a final order entered in the case. Jamey asserted that attorney's fees should be allowed because the amounts he paid in attorney's fees were not available to support the minor children, who had been in his custody since the proceedings began.

The last hearing in the case was held on May 26, 2021. At that hearing, no testimony was taken, and the parties argued the issues of child support and contempt.

III. *The Final Order and Order Awarding Attorney's Fees*

The final order was entered on July 27, 2021.[4]  In the final order, the trial court found:

> During the course of the last two and one-half years this Court has conducted numerous hearings, initially in open court and subsequently via [Z]oom.  I have had many opportunities to observe both parties carefully during sworn testimony as well as observing their general demeanor in open court.  I have paid careful attention to each parties' testimony, observing their individual presentations, comparing their testimony and evidence submitted with that submitted by the opposing party for the purpose of determining their credibility and the weight to be afforded each presentation.
>
> As between Jamey and Angela, Angela is the least credible.  I find Angela's credibility challenged by her personality traits of self-importance, self-righteousness, refusal to recognize authority other than her own, and an aggressive attitude toward anyone that disagrees with her.
>
> As to contested points between the parties, in particular with regard to the children, I have consistently found Jamey's position not only more credible than that of Angela, but in addition, Jamey's requests, recommendations and actions toward the children have been in the children's best interest whereas Angela has looked to her own interests throughout this litigation.
>
> This Court appointed an Ad Litem for the children ... [whose] work in this challenging case has been most admirable....  With the exception of two points noted below I hereby adopt his post-trial brief in its entirety as if it were set out herein and attached hereto.  I adopt his findings of fact and conclusions of law found therein as they are consistent with the findings and facts and conclusions of law of this Court herein stated.  The Court for reasons stated below does not accept the Ad Litem's recommendation of mid-week visitation with Angela and further does not accept the directive as to where the children will attend church.

---

[4]In the final order, the trial court noted that much of the evidence submitted at trial involved Angela's mental condition as it applied to the previous proceedings before the Arkansas State Medical Board and the temporary suspensions of her medical license.  The trial court stated further that such evidence pertained to Angela's fitness to practice medicine and not her fitness as a parent.  That being the case, the trial court stated that it disregarded all the medical evidence related to the suspensions of Angela's medical license.

17

In the final order, the trial court also adopted Jamey's post-trial brief to the extent it was not inconsistent with the court's rulings, which will be discussed as necessary in our analysis of Angela's points on appeal.

On the issue of child custody, the trial court found that although joint custody is favored in Arkansas, it was not appropriate in this case because Angela lacked the ability to set herself aside for the benefit of the children and would not or could not work with Jamey to coparent and could not foster a relationship between the children and Jamey. The trial court agreed with the attorney ad litem's recommendation and awarded primary custody to Jamey, making these findings in support of its custody decision:

> Angela has used the children in an attempt to make Jamey's life unbearable to the point that he would have to return to the marriage. When it became apparent to Angela that the divorce was inevitable, she used her influence to create a hatred in the children toward Jamey to such a degree that the children's mental and emotional well-being may be permanently impaired. In seeing how the children treated Jamey as a result of Angela's direction and encouragement I found it understandable if Jamey had given up custody and taken the easy road of submitting the children to the custody of Angela. Fortunately for the children this did not happen. If these children have any hope of recovery from the negative results of Angela's actions, it will only be because of Jamey's efforts.

With respect to visitation, the trial court awarded Angela standard visitation but stated that Angela's manipulation of the children and the likelihood that it would continue militated against additional midweek visitation as recommended by the attorney ad litem. The trial court also found that Jamey would be in charge of all aspects of the children's lives, including which church they attend.

18

The final order also addressed current child support and back child support. In setting Angela's current support going forward, the trial court adopted Angela's child-support worksheet that was submitted using the Income Shares Model and set the child-support amount at $2745 a month. The trial court also gave Angela a credit for $23,155 in overpaid temporary support, which pertained to the time period from when the Income Shares Model went into effect and the entry of the final order, during which time Angela was paying $4850 a month and should have been required to pay only $2745 a month under the revised child-support guidelines. With respect to back child support, the trial court ordered Angela to pay $99,363.71,[5] which represented the amount of retroactive temporary child support that accrued between February 2018 when Jamey was awarded temporary custody and November 2019 when Angela was first ordered to begin making monthly support payments. In setting the back child support, the trial court stated that the evidence did not warrant giving Angela a setoff for her expenditures on behalf of the children, and in denying such setoff, the court considered the fact that Angela had occupied the parties' marital residence for twenty-nine months at no cost to her. The trial court also ordered Angela to reimburse Jamey $23,427.40, which represented one-half of the education costs of the children's private schooling.

The trial court ordered that Angela's sister, Andrea Chrisman, shall not be left alone with or communicate with any of the children except as authorized in the final order. The

---

[5]This award of back child support was based on Jamey's calculations as set forth in his post-trial brief.

trial court found that Andrea posed a clear threat to the emotional well-being of the children and that if she wished to see the children, she must notify Jamey in writing. In that event, Jamey would hire a person of his choice to supervise the visitation at a time and place of Jamey's choosing, with Andrea to pay the cost of the supervision.

In the final order, the trial court also found Angela in contempt based on the allegations made by Jamey in his June 19, 2018 and November 6, 2018, motions for contempt, wherein Jamey had alleged that Angela sent him harassing text messages and had made derogatory remarks about him in front on the children. For each of these contempt findings, the trial court ordered Angela committed to the county detention center for thirty days, suspended on the condition that Angela never again disregard the court's order not to malign, harass, or in any way communicate negatively toward Jamey.

Lastly, the final order addressed Jamey's motion for attorney's fees. The trial court stated that the parties would pay their own attorney's fees incurred after the four-day trial held between July 30 and August 7, 2019, and it would base the attorney's fees on the time period between when the case was initiated in February 2018 through the completion of the four-day trial. The trial court ordered Jamey's counsel to provide an itemized list of his time and expenses corresponding to that time period.

On July 28, 2021, Jamey's counsel submitted an affidavit along with an itemized billing of the attorney's fees and costs incurred between February 2, 2018 and August 6,

2019. In the affidavit, Jamey's counsel stated that during this time period, he billed a total of $49,937.50 in attorney's fees and $4802.02 in costs, for a total of $54,737.52.[6]

On August 24, 2021, the trial court entered an order awarding Jamey $54,737.52 in attorney's fees and costs. In the order awarding attorney's fees, the trial court found:

> The attorney's fees and costs award is authorized by statute and case law, and the court makes an additional finding that the attorney's fees and costs are appropriate because the attorney's fees incurred by Jamey throughout the course of litigation and ordered to be paid herein were not available to support the parties' minor children who have been in Jamey's custody the entirety of the case.

Angela now appeals from both the final order and the order awarding attorney's fees.

## IV. *Arguments on Appeal*

In this appeal, Angela raises eight arguments for reversal. We review each argument in turn.

## A. Child Custody

Angela's first argument on appeal is that the trial court erred in awarding primary custody of the children to Jamey. Our standards in deciding the issue of child custody are well settled.

Arkansas Code Annotated section 9-13-101(a)(1)(A)(i) (Repl. 2020) provides that, in an action for divorce, the award of custody of a child born of the marriage shall be made without regard to the sex of a parent but solely in accordance with the welfare and best interest of the child. The best interest of the children is the polestar in every child-custody

---

[6]These attorney's fees and costs actually total $54,739.52, but this discrepancy is not at issue on appeal.

case; all other considerations are secondary. *Fox v. Fox*, 2015 Ark. App. 367, 465 S.W.3d 18. On appeal, in custody matters, we consider the evidence de novo and do not reverse unless the trial court's findings of fact are clearly erroneous. *Id.* Due deference is given to the trial court's superior position to judge the credibility of the witnesses. *Chaffin v. Chaffin*, 2011 Ark. App. 293. The supreme court has held that there is no other case in which the superior position, ability, and opportunity of the trial court to observe the parties carries a greater weight than one involving the custody of minor children. *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001).

Angela argues that based on the evidence presented, it was in the children's best interest to be placed in her custody. She asserts that when Jamey moved out of the marital home in February 2017, he abandoned her and the children for a period of a year. She states that Jamey further upended the children's lives when he filed for divorce, gained temporary custody, and removed the children from home schooling, which they had been doing their entire lives.

Angela also contends that Jamey has shown an unjustifiable pattern of attacking what he deems are her unconventional religious beliefs. She notes that in Dr. Adams' psychological evaluation of her, he found that she was very committed to her religious beliefs and that her belief in demons is consistent with those beliefs. Angela notes further that, in Dr. Adams' evaluation of Jamey, he found that Jamey has the possibility of being manipulative and it is likely that Jamey's anger could escalate quickly when challenged.

22

Angela asserts that she was the children's primary caregiver before Jamey's initiation of these divorce proceedings and that Jamey has poor parenting skills, both of which militate in favor of her having custody. She contends that Jamey's inability to parent is evidenced by the fact that he filed a FINS petition against two of his own children. Angela further asserts that Jamey has demonstrated a propensity for violence against both her and the children, some of which resulted in DHS involvement. She states that Jamey does not get along with the children, he cannot control them, and that while the children are with him, there is a lack of respect and constant arguing. Finally, Angela asserts that all the children would prefer to live with her. Angela argues that she provides a more stable environment for the children and that it is in the children's best interest to be placed in her custody.

We initially observe that although Angela discussed the possibility of joint custody in her testimony below, she makes no argument for joint custody on appeal. The trial court found that joint custody was not appropriate in this case, and we would affirm that ruling even were it being challenged on appeal. Arkansas Code Annotated section 9-13-101(a)(1)(A)(iii) (Repl. 2020) provides that, in an action for divorce, an award of joint custody is favored in Arkansas.[7] However, we have held that, regardless of whether joint custody is

---

[7]Arkansas Code Annotated section 9-13-101 was amended during the 2021 Arkansas legislative session to create a rebuttable presumption that joint custody is in the best interest of the child concerning an original custody determination in a divorce or paternity matter. *See* Ark. Code Ann. § 9-13-101(a)(1)(A)(iv) (Supp. 2023). However, this subsection became effective on July 28, 2021, which was one day after the final order was entered in this case awarding primary custody to Jamey. Therefore, the rebuttable presumption of joint custody has no application here.

favored, our law remains that the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the child's welfare is a crucial factor bearing on the propriety of an award of joint custody, and such an award is reversible error when cooperation between the parties is lacking. *Hoover v. Hoover*, 2016 Ark. App. 322, 498 S.W.3d 297. Our law remains consistent that custody awards are to be made solely in accordance with the welfare and best interest of the children. *Fox*, *supra*. Due to the hostility between Jamey and Angela and their inability to cooperate in coparenting the children, it is evident that joint custody would not have been in the children's best interest.

With regard to which parent should be awarded primary custody, we conclude that the trial court did not clearly err in determining that it was in the children's best interest to be placed in the custody of their father. Angela correctly asserts that she was the primary caregiver during the parties' marriage and that the children have stated a preference to live with her. However, although the issue of which parent has been the primary caretaker is relevant and worthy of consideration, it is not in and of itself determinative of custody. *Cunninham v. Cunningham*, 2019 Ark. App. 416, 588 S.W.3d 38. Moreover, a child's reasonable preference is but one factor in deciding custody and is not binding on the trial court. *Williams v. Williams*, 2019 Ark. App. 186, 575 S.W.3d 156.

While the children stated a preference to live with Angela and consistently showed disrespect and disdain while in Jamey's care, the trial court found that Angela was influencing and encouraging the children's behavior to create a hatred toward Jamey that jeopardized the children's psychological and emotional well-being. This finding was

24

supported by the record. Evidence of the children's instructed animosity toward their father includes them ransacking his house and routinely referring to him as an idiot, a jerk, and Hitler. There was testimony that on two separate occasions, the parties' youngest child stated that the children were supposed to be misbehaving and treating their father as poorly as possible. Angela's manipulation of the children in this regard weighed significantly on the trial court's custody determination.

Although the children expressed the desire to be home schooled instead of attending the private school where Jamey had enrolled them, the children were doing very well in private school while in Jamey's temporary custody. The children's attorney ad litem, who was well acquainted with the case, recommended that the children be placed in Jamey's custody, and the trial court agreed with that recommendation. Having reviewed the entire record, we are not left with a definite and firm conviction that the trial court made a mistake in awarding primary custody of the children to Jamey. Therefore, we affirm the trial court's custody decision.

### B. Visitation

The main consideration in determining visitation is the best interest of the children, and we will not reverse the trial court's findings pertaining to visitation unless they are clearly erroneous. *Favano v. Elliott*, 2012 Ark. App. 484, 422 S.W.3d 162. Here, after the trial court awarded Jamey primary custody of the children, it awarded Angela standard visitation. Angela's only argument regarding visitation is that because the custody decision was erroneous, the visitation order was erroneous as well. Having affirmed the trial court's

25

custody decision for the reasons explained *supra*, we also affirm the trial court's visitation award.

## C. Contempt

During the divorce proceedings, the trial court made three findings of contempt against Angela for violations of the trial court's orders. The first finding of contempt came on May 10, 2019, when the trial court entered an order finding that Angela was in contempt for arguing extensively with Jamey in an overbearing manner in front of one or more of the children. The other findings of contempt were in the final order entered on July 27, 2021, when the trial court found Angela in contempt for sending Jamey harassing text messages and making derogatory remarks about him in front of the children. Angela argues that each of these contempt orders is invalid and should be reversed.

As an initial matter, we conclude that we are without jurisdiction to review the trial court's initial finding of contempt in the May 10, 2019 order because that order was not timely appealed. An appeal may be taken from a civil or criminal contempt order, which imposes a sanction and constitutes the final disposition of the contempt matter. Ark. R. App. P.–Civ. 2(a)(13). In the May 10, 2019 order of contempt, the trial court sentenced Angela to thirty days in the county detention center, suspended on the condition there be no further violations of the court's orders, and the trial court also ordered her to pay attorney's fees incurred in the contempt matter.[8] The supreme court has held that

---

[8]Angela was ordered to pay $2250 in attorney's fees in a separate order entered six days later.

interlocutory orders that are reviewable under Rule 2(a) must be appealed within thirty days of entry, and if the appellant fails to timely appeal from the order, the interlocutory order is not later reviewable under Rule 2(b) (providing the general rule that an appeal from any final order also brings up for review any intermediate order involving the merits and necessarily affecting the judgment). *In Re Est. of Stinnet*, 2011 Ark. 278, 383 S.W.3d 357. Because the May 10, 2019 order was an appealable order from which Angela did not appeal, we cannot review that order, and her appeal from that order is dismissed.

With respect to the two findings of contempt in the July 27, 2021 final order from which Angela timely appealed, she first argues that these contempt findings were invalid because for each of them she received indefinite suspended sentences. Angela argues, in the alternative, that each of these findings of contempt was against the preponderance of the evidence. We agree with Angela's first argument.

It is well settled that suspension of a sentence for contempt is, in effect, a complete remission of the contempt. *Henry v. Eberhard*, 309 Ark. 336, 832 S.W.3d 467 (1992). In *Higgins v. Merritt*, 269 Ark. 79, 598 S.W.2d 418 (1980), the appellant was found to be in contempt and was sentenced to two days in jail, with the sentence suspended, and the supreme court declined to reach the contempt issue on appeal. The supreme court wrote:

> It is first argued that on the proof the chancellor erred in finding the appellant to be in contempt. We do not reach the merits of this argument, because an attempt to suspend the execution of a sentence for contempt of court, other than a mere postponement, is invalid and amounts to a complete remission of the punishment. The point being moot, the decree is accordingly modified to set aside the sentence for contempt.

27

*Higgins*, 269 Ark. at 80, 598 S.W.2d at 419 (citations omitted). In *Henry*, *supra*, the supreme court held that if the suspended sentence is suspended conditionally for a specific period of time, the suspension amounts to a mere postponement rather than a remission.[9] The effect of these supreme court holdings is that a trial court cannot *indefinitely suspend* a contempt sentence but can conditionally postpone a sentence for a *specified period of time*. *See Kilman v. Kennard*, 2011 Ark. App. 454, 384 S.W.3d 647.

In the final order, for each of its findings of contempt against Angela, the trial court sentenced her to thirty days in the county detention center, suspended on the condition she never again disregard the court's orders not to malign, harass, or in any way communicate negatively toward Jamey. These suspensions were for an indefinite time period, and the indefinite suspensions of Angela's sentences were invalid and amounted to a complete remission of the contempt and punishment. *See Higgins*, *supra*; *Henry*, *supra*. That being so, the two findings of contempt in the trial court's final order are moot and, accordingly, are set aside.

D.  Child Support Going Forward

Angela next argues that the trial court's award of child support going forward was erroneous. In setting Angela's current child support going forward, the trial court adopted

---

[9]In *Henry*, the appellant was found in contempt and fined $250 and sentenced to thirty days in jail, both of which were suspended for one year conditioned upon full compliance with the court's orders.

Angela's child-support worksheet that was submitted using the Income Shares Model and set child support at $2745 a month.

Our standard of review for an appeal from a child-support order is de novo on the record, and we will not reverse a finding of fact by the trial court unless it is clearly erroneous. *Smith v. Smith*, 2022 Ark. App. 514, 656 S.W.3d 198. In reviewing a trial court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be given to their testimony. *Id.* In a child-support determination, the amount of child support lies within the sound discretion of the trial court, and that court's findings will not be reversed absent an abuse of discretion. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). However, a trial court's conclusions of law are given no deference on appeal. *Id.*

Under this point, Angela does not quarrel with the amount of current monthly child support that was ordered by the trial court in the event the trial court's child-custody decision is affirmed on appeal. Instead, Angela's only argument here is that because the trial court erred in awarding custody to Jamey, it also erred in ordering her to pay prospective child support. *See Ellington v. Ellington*, 2019 Ark. App. 395, 587 S.W.3d 237 (stating that when custody is reversed, the award of child support is likewise reversed). However, because we are affirming the trial court's custody decision, we also affirm its award of current child support going forward.

E. Back Child Support

29

Angela also argues that the trial court's award of back child support in its final order was erroneous. Our standard of review for back child support is the same here as in our discussion of the previous point on appeal.

Angela contends that the trial court's award of $99,363.71 in back child support, which correlates to the period between February 2018 when Jamey was awarded temporary custody of the children and November 2019 when Angela was first ordered to pay temporary child support, was an abuse of discretion.[10] In awarding the back child support, the trial court made these findings:

> The Court agrees with Jamey's calculations of child support as set out in Jamey's post-trial brief and specifically finds that the use of capital gains from the 2017 sale of real property to determine the income subject to child support is appropriate. This Court orders back child support in the amount of $99,363.71 to be paid by Angela to Jamey forthwith.

> This Court finds there is no justifiable basis to offset Angela's child support obligation based on Angela's expenses paid on behalf of the children. In determining this denial, this Court has taken into consideration that Angela's occupation of the marital home for 29 months at no cost to her personally.

As a preamble to this section of the opinion and to preface the complexity of this issue, we acknowledge that during the pendency of this case, Administrative Order No. 10, which sets forth child-support calculations, has evolved and existed in three distinct forms. Early in the litigation, what we refer to as the "prior Administrative Order No. 10" was still

---

[10]Angela does not challenge the trial court's interim order to pay $4850 in temporary monthly child support beginning on November 22, 2019. Angela evidently abided by that order and paid $4850 in monthly child support from then until entry of the final order being appealed.

in effect. Then, on April 2, 2020, the supreme court issued its per curiam, *In re Implementation of Revised Administrative Order No. 10*, 2020 Ark. 131 (per curiam), which introduced what is now known as "the Shared Incomes Approach" to Administrative Order No. 10 for "all support orders entered after June 30, 2020." 2020 Ark. 131, at 1. Then, Administrative Order No. 10 was amended again effective October 6, 2022, which provided additional clarification. With that said, we turn to Angela's arguments.

The period for the back child-support calculation that is under review in this case commenced in February 2018 and ended in November 2019. This is the period during which Jamey was awarded temporary custody of the children, but Angela was not ordered to pay contemporaneous child support. Angela does not argue that she does not owe back support for this period; rather, she argues that the court erred in its calculations.

Angela's initial argument is that the Income Shares Model, as implemented in the revised version of Administrative Order No. 10 that became effective on June 30, 2020, should be used. However, we disagree. In *In re Implementation of Revised Administrative Order No. 10*, *supra*, the supreme court stated that the new guidelines shall be used for all support orders entered after June 30, 2020. The back child support at issue herein accrued between February 2018 and November 2019, which was before the 2020 revision became effective. In the context of legislation, our supreme court has observed a strict rule of construction against retroactive operation and indulges in the presumption that the legislature intends statutes, or amendments thereof, to operate prospectively only and not retroactively unless it expressly states otherwise. *Bean v. Off. of Child Support Enf't*, 340 Ark. 286, 9 S.W.3d 520

(2000). While we acknowledge that the Shared Incomes Approach in the revised Administrative Order No. 10 is not legislative in nature, we believe that the prospective rationale in *Bean* is appropriate. That is to say, we believe that the statement in *In re Implementation of Revised Administrative Order No. 10* that the new guidelines shall be used *for all support orders entered after June 30, 2020*, is prospective in nature and not retroactive to back support orders. We observe that there is nothing in the 2020 revised version of Administrative Order No. 10 implemented by the supreme court to indicate retroactive application. Moreover, in *Akins v. Mofield*, 355 Ark. 215, 132 S.W.3d 760 (2003), in a previous review of changes to Administrative Order No. 10, the supreme court held that, in awarding back child support, the prior Administrative Order No. 10 *and its predecessor child-support guidelines* set out the presumptively correct amount of support *for those years in which the guidelines were in place*. Taking all of this into consideration, in reviewing the issue of back child support in this case, we are guided by the prior Administrative Order No. 10 that was applicable when the back child support accrued.

Angela next argues that, even assuming that prior Administrative Order No. 10 applies during this period (which we so hold) the trial court made insufficient findings to support its award of back child support and, in particular, failed to set forth her income, reference the family support chart, or state whether it was deviating from the chart amount. Angela argues further that the trial court should have reduced the back child support because she had the children half the time from February 2018 to June 2019. Prior Administrative

32

Order No. 10, section V(b)(6) (2019)[11] provides that the deviation considerations include the extraordinary time spent with the noncustodial parent or shared-custody arrangements. Angela also argues that the trial court erred in not reducing the back child support by failing to consider expenses she made on behalf of the children as reflected on an expense report she introduced at trial. Prior Administrative Order No. 10, section (V)(a) provides that deviation considerations include various expenses made for the children. Finally, Angela contends that the trial court erred in using a one-time capital gain from the 2017 sale of the parties' real property to increase her back child support.[12]

We agree that the trial court failed to make key findings necessary for its award of back child support under prior Administrative Order No. 10. Section (III)(c) provides that, for self-employed payors, support shall be calculated based on the last two years' federal and state income tax returns and quarterly estimates for the current year. Prior Administrative Order No. 10, section (I) provides that it is a rebuttable presumption that the amount of child support calculated pursuant to the family support chart is the amount of child support to be awarded and that the court may grant less or more support if the evidence shows that the needs of the dependents require a different level of support. Section (I) further provides

---

[11]In the remainder of our discussion of this point on appeal involving back child support, we refer to this applicable version of Administrative Order No. 10, which was effective from 2016 through 2019.

[12]There was testimony and documentation showing that, in 2017, the parties sold real property for $1 million. This transaction resulted in a capital gain of $154,872 for each party, which was reflected on their individual income tax returns.

that all orders granting child support shall contain the court's determination of the payor's income, recite the amount of child support required under the guidelines, and recite whether the court deviated from the family support chart.

Instead of making the necessary findings required by prior Administrative Order No. 10, the trial court stated that it agreed with Jamey's calculations as set in his post-trial brief, it adopted his post-trial brief to the extent it was not inconsistent with the trial court's findings, and it awarded $99,363.71 in back child support. On the issue of back child support, Jamey's post-trial brief stated in pertinent part:

> Once the court has reached a conclusion regarding the child support figures for 2019 and 2018, the court may consider back child support if so inclined. Jamey's exhibit 20 set out that back child support as of the end of June 2019 was $86,974.97. The court authorized an update and through the date that Angela started paying support in November 2019; the back child support figure grew to $99,363.71. Jamey had to support the children without any assistance from Angela. Angela should be ordered to pay this amount forthwith.

Jamey's exhibit 20, *which was incorporated by reference by the court*, referenced above in Jamey's post-trial brief, is a back child-support worksheet positing that Angela owes $5707.45 for ten months in 2018 and $4850 for six months in 2019, for a total of $86,974.97. This exhibit does not contain Angela's income nor does it contain any explanation for the increase from $86,974,97 to $99,363.71. Exhibit 20 also notes, "Each year receives 100% reduction for one month" and "50% reduction for 8 weeks," indicating that Jamey's calculation of Angela's back child support may have included a downward deviation. However, neither Jamey's post-trial brief (which was adopted by the trial court) nor his exhibit 20 referenced therein

34

contain the necessary findings to support the award of back child support, and the trial court did not make sufficient findings of its own in the final order being appealed.

Our case law establishes that utilizing the family support chart contained in prior Administrative Order No. 10 is mandatory when setting child support. *Maxwell v. Maxwell*, 2020 Ark. App. 23, 593 S.W.3d 499. There is a rebuttable presumption that support awarded pursuant to the chart is the appropriate amount of support and can be modified only upon written findings stating why the application of the chart amount would be unjust or inappropriate. *Id.*

Here, in awarding the back child support, the trial court did not, inter alia, recite Angela's income, recite the amount of support required under the guidelines, state whether the court was applying the chart amount, state whether it was deviating from the chart amount, or state reasons why the application of the chart amount would be unjust or inappropriate. Because the trial court failed to make the requisite findings to support its award of back child support, we must reverse and remand the issue of back child support for the trial court to decide in accordance with our opinion. In arriving at the amount of back child support, because this was an issue below, we hold that the trial court *may* consider Angela's capital gain from 2017 in conformance with our supreme court's holding that "income" is intentionally broad and designed to encompass the widest range of sources consistent with the State's policy to interpret "income" broadly for the benefit of the child. *See Evans v. Tillery*, 361 Ark. 63, 204 S.W.3d 547 (2005) (discussing prior Administrative Order No. 10, section (II)(a)'s provision that "[i]ncome means any form of payment, periodic

35

or otherwise, due an individual, regardless of source"). The trial court should also consider the deviation factors outlined in prior Administrative Order No. 10, and if the court deviates from the chart amount, it must include specific written findings stating why the amount is unjust or inappropriate. *See Deline v. Deline*, 2019 Ark. App. 562, 591 S.W.3d 365.

### F. Private School Expenses

Angela next argues that the trial court erred in ordering her to pay half of the children's private school expenses incurred by Jamey. In Jamey's post-trial brief (which was incorporated by reference by the court), he asserted that he had paid a total of $46,854.80 for the costs of the children's private schooling, and he attached documentation showing itemized payments allegedly made between March 2018 and July 2020. In the final order entered by the trial court, Angela was ordered to pay half this amount, or $23,427.40.

Angela argues that she opposed placing the children in private school and that she should not be responsible for the costs incurred by Jamey in deciding to place them there. Angela argued this in her response to Jamey's post-trial brief, where she stated that she adamantly opposed private school and that it was solely Jamey's decision to place the children in private school. Angela also noted in her post-trial brief that the children began attending public schools in Clarksville beginning in the 2020–2021 school year.

In support of her argument, Angela cites *Hyden v. Hyden*, 85 Ark. App. 132, 148 S.W.3d 748 (2004). While *Hyden* may be instructive, it is not dispositive on this issue. In *Hyden*, the trial court was faced with setting child support based on the speculative future event of where the minor child would complete his junior and senior years in high school.

Apparently, the parties and the court were attempting to foresee into the future and determine whether the minor child would attend Hargrave Military Academy or Catholic High. The tuition at the two schools was vastly different. The evidence was clear in the record that the noncustodial parent could not afford to pay child support and the higher tuition to Hargrave Academy. The trial court, by its own words, attempted to "do some equity" and fashioned a child-support obligation that required the noncustodial parent to pay a considerable portion of the Hargrave Academy tuition. On appeal, we reversed and held:

> It is a matter within the custodial parent's right to send or to continue to send his child to any particular school. However, if he chooses to continue sending the child to a $24,000 per year school, he should not expect and we should not countenance requiring the noncustodial parent to pay any more than the chart requires. Any school expenses in excess of the child support paid by appellant to appellee will be the appellee's responsibility, as it was his or his son's decision to incur the substantially increased expenses to attend Hargrave Academy.

*Hyden*, 85 Ark. App. at 142–43, 148 S.W.3d at 754.

Under the circumstances of this case, in our de novo review, we hold that the trial court clearly erred in dividing the costs of the children's private schooling and requiring Angela to pay half that amount. We note that under prior Administrative Order No. 10, section (V)(a)(5), educational expenses may be used as a *relevant factor to consider* in deciding whether to deviate from the chart amount of child support. Here, the trial court effectively increased Angela's child support by ordering her to pay half the private school expenses without making the findings required for a deviation. Although we reverse the trial court's

decision on this point, on remand of the back-child-support issue, the trial court may, in its discretion, consider these educational expenses as a factor in arriving at the support.

G. The Restrictions on the Children's Relationship with Angela's Twin Sister

In the final order, the trial court ordered that Angela's twin sister, Andrea, not be left alone with the children or communicate with them in any way except as authorized in the order. The trial court found that Andrea "poses a clear threat to the emotional well-being of the children based on earlier findings resulting from her testimony in open court." The trial court ordered that, if Andrea wished to see the children, the visitation would be supervised by a person of Jamey's choosing.

Angela argues that the trial court's restrictions on the children's relationship with their aunt was erroneous. As an initial matter, Angela takes issue with the trial court's statement that it had made "earlier findings" and asserts that no such earlier findings were made. Angela further asserts that Andrea poses no threat to the children and that she often saw them at church, at their home, and when they were on vacations together. Angela asserts that Andrea does not drink alcohol or do drugs and that she is not a felon or sex offender. Finally, Angela suggests that the trial court's restrictions on the children's contact with Andrea was motivated by Andrea's religious beliefs and resulted in religious discrimination. Angela cites *Lewis v. Lewis*, 260 Ark. 691, 543 S.W.2d 222 (1976), where the supreme court stated that visitation rights cannot be denied a parent for espousing his or her religious beliefs.

Having reviewed the record, we see no error in the trial court's restrictions regarding the children's contact with Andrea. Although the trial court may not have made "earlier findings" on the issue as stated in the final order, we do not view this discrepancy as reversible error. The testimony at trial showed that Andrea had exhibited concerning behavior, including praying in the presence of the children for a spirit of confusion to come upon one of Jamey's sisters and her family. Andrea also thought Jamey's sister was a witch and controlled Andrea's mind, and Andrea shared this with the children. There was also testimony that, while working at Angela's clinic, Andrea put a Walmart bag on her head and stated that she had to wear it to keep the sex witches away. As a result of Andrea's behavior at the clinic, she was banned from the clinic by the Arkansas State Medical Board. Finally, the children's attorney ad litem, who was very familiar with the case, recommended that the children have no contact with Andrea unless it was supervised by someone other than a relative. While we agree with the principle that a parent's visitation rights cannot be denied for their religious beliefs, we observe that Andrea is not these children's parent, and we further conclude that the trial court's decision to limit the children's contact was motivated not by religious considerations but rather by the well-being of the children. We hold that, on this record, the trial court did not clearly err in finding that it was in the children's best interest to have only restricted contact with Andrea.

### H. Attorney's Fees

Angela's last argument is that the trial court erred in ordering her to pay Jamey's attorney's fees. The trial court awarded Jamey $54,737.52 in attorney's fees and costs, which

represented all of Jamey's fees incurred between when the case began in February 2018 and the end of the four-day trial concluding in August 2019.[13] In its August 24, 2021, order awarding attorney's fees, the trial court found:

> The attorney's fees and costs award is authorized by statute and case law, and the court makes an additional finding that the attorney's fees and costs are appropriate because the attorney's fees incurred by Jamey throughout the course of litigation and ordered to be paid herein were not available to support the parties' minor children who have been in Jamey's custody the entirety of the case.

In domestic-relations proceedings, the trial court has the inherent power to award attorney's fees, and the decision to award fees and the amount of those fees are matters within the discretion of the trial court. *Barter v. Barter*, 2024 Ark. App. 182, 686 S.W.3d 872. In determining whether to award fees, the trial court is to consider the relative financial abilities of the parties. *Chambers v. Chambers*, 2017 Ark. App. 429, 527 S.W.3d 1. Because the trial court presides over the case and gains familiarity with it as well as the extent and quality of the services rendered by the attorney, it has a superior opportunity to assess the critical factors, and an award of attorney's fees will therefore not be set aside absent an abuse of discretion. *Id.*

In challenging the attorney's fees, Angela initially argues that because the trial court's custody order should be reversed, so should the attorney's fees. However, because we are

_____

[13]After the four-day trial concluded in August 2019, two years passed before the final order was entered. The trial court, in its discretion, awarded Jamey attorney's fees from the commencement of the litigation through the last day of the four-day trial. The trial court, in this order, did not award Jamey attorney's fees for the two-year period posthearing.

affirming the custody award to Jamey, this argument provides no basis to reverse the attorney's fees.

Angela also raises various other arguments in support of reversing or reducing the attorney's fees. Angela argues that the fees incurred by Jamey that involved the proceedings before the Arkansas State Medical Board should not have been allowed because (although the trial court ruled all of this evidence admissible) the trial court ultimately decided not to consider that evidence in reaching its custody decision. Angela argues further that no attorney's fees should have been awarded at all because Jamey fostered the children's bad behavior and also because the parties agreed to evenly divide their property. We, however, do not agree that any of these considerations controlled the trial court's discretionary decision regarding attorney's fees.

We do, however, find that two contentions raised by Angela on this issue are well taken. First, Angela takes issue with the trial court's finding that the attorney's fees are appropriate in part because the attorney's fees incurred by Jamey throughout the course of litigation were not available to support the parties' minor children who have been in Jamey's custody the entirety of the case. Angela argues that, because the trial court had already awarded Jamey back child support of $99,363.71, the trial court conflated child support and attorney's fees. We agree that, although the trial court has inherent power to award attorney's fees in such cases and may do based on the relative financial abilities of the parties, the fees should not be used as a direct substitute for child support that has already been awarded.

41

Angela notes further that, after the trial court found her in contempt in its interim order entered on May 10, 2019, it later ordered her to pay the associated attorney's fees of $2550. We agree that because Angela had already been ordered to pay these attorney's fees in an interim order, these fees of $2550 should not have been also included in the amount of attorney's fees she was ordered to pay in the August 24, 2021, order. However, in our review of Jamey's counsel's itemized billing of the attorney's fees and costs incurred between February 2, 2018, and August 6, 2019, upon which the trial court relied in awarding attorney's fees, we are unable to determine whether the $2550 in attorney's fees previously awarded on the contempt issue were included. We admonish the trial court that the $2250 in attorney's fees previously awarded should not be included in any additional award of attorney's fees since this would result in a double recovery for those fees.

Because we are reversing and remanding the back-child-support issue for further findings by the trial court, we also reverse and remand the award of attorney's fees because these issues are intertwined. *See Smith v. Smith*, 2023 Ark. App. 521. On remand, we instruct the trial court to reconsider the attorney's-fees issue in light of the considerations expressed above.

## V. *Conclusion*

In conclusion, we affirm the trial court's decision to award Jamey custody of the children and we also affirm its award with respect to Angela's visitation. We affirm the child-support award of $2750 a month going forward, and we affirm the trial court's restrictions on the children's contact with Angela's twin sister, Andrea. We reverse the trial court's

42

decision that required Angela to pay half of the children's private school expenses, but we note that the trial court may consider these expenses as a deviating factor should it choose to deviate from the chart amount in arriving at back child support as discussed above. On the issue of back child support and attorney's fees, we reverse and remand for further consideration and findings consistent with this opinion. Finally, on the contempt issue, we reverse the two findings of contempt in the trial court's final order and we dismiss the appeal with respect to the trial court's finding of contempt in its interim order from which Angela did not appeal.

Affirmed in part; reversed in part; reversed and remanded in part; dismissed in part.

BARRETT and WOOD, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*McDaniel Wolff PLLC*, by: *Bart W. Calhoun*, for appellee.