Cite as 2025 Ark. App. 494

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-24-624

| | | |
|---|---|---|
| NATALIE INMON | | Opinion Delivered October 22, 2025 |
| | APPELLANT | APPEAL FROM BENTON COUNTY CIRCUIT COURT [NO. 04DR-23-869] |
| V. | | |
| RODNEY DAVIS | | HONORABLE DOUG SCHRANTZ, JUDGE |
| | APPELLEE | AFFIRMED |

**STEPHANIE POTTER BARRETT, Judge**

Appellant Natalie Inmon appeals from the Benton County Circuit Court's April 15, 2024 divorce decree that awarded primary custody of the parties' minor daughter (MC) to appellee Rodney Davis. Appellant argues that the circuit court erred (1) in finding it was in the child's best interest for Davis to have primary custody; (2) in restricting the child's contact with Inmon's new romantic partner, Sam Couch, during her visitation; and (3) in restricting Inmon from leaving the child in the care of Couch's family members during visitation. We affirm.

I. *Standard of Review*

Our standard of review in child-custody matters is well settled. This court reviews custody cases de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Styles v. Styles*, 2024 Ark. App. 435, at 3, 699 S.W.3d 693, 698. A finding

is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* Due deference is given to the circuit court's superior position to determine the credibility of witnesses and the weight to be given to their testimony. *Id.* As to issues of law, however, we give no deference to the circuit court; rather, we review issues of law de novo. *Id.*

II. *Facts and Procedural History*

Inmon and Davis have a long history as a couple, which includes two marriages. They share two daughters: MacKenzie, who was born during their first marriage and has reached the age of majority; and MC, who was born on April 29, 2020. The parties were married for a second time on September 5, 2021, and separated on May 26, 2023.

On May 26, 2023, Inmon took MC, left the marital home in Scott, Lonoke County, and moved into the home of Sam Couch in Gravette, Benton County. Inmon filed her complaint for divorce, alleging general indignities, on May 31, 2023. Davis filed his counterclaim for divorce, alleging general indignities, on September 18, 2023. Both parties requested primary custody of MC.

When Inmon left in May 2023, she did not tell Davis where she was going and cut off almost all contact between MC and Davis until October 2023, when the circuit court entered a first temporary custody order. The first agreed order granted Inmon temporary custody of MC and allowed Davis supervised visitation. An agreed second temporary custody order was entered on January 11, 2024, and an amended version of that order was entered

the next day, January 12. The amended second order granted Inmon and Davis joint custody for rotating weekly periods and placed specific limitations on how third parties could be involved in MC's care, including specific requirements that custody exchanges could not be carried out by third parties absent a verifiable emergency and that neither party should leave the child with a third party overnight.

The circuit court held a final hearing on the divorce and custody decree on April 5, 2024. The testimony at that hearing was the basis for the circuit court's orders now on appeal. A summary of the relevant testimony follows.

The parties' adult daughter MacKenzie testified at length, and her testimony formed a significant basis for the circuit court's custody rulings upon —the court's finding that her testimony was more credible than that of Inmon. MacKenzie, who lived with her parents until she left home for college in August 2021 and remained close with both parents, expressed serious concerns about how unstable Inmon's life had become since her separation from Davis.

First, MacKenzie testified to the manner in which Inmon separated from Davis. MacKenzie testified that in the period shortly before Inmon left Davis, Inmon often dropped MC off with MacKenzie at her apartment in Fayetteville, and eventually, she realized Inmon was leaving MC with her to meet up with Sam Couch. On the day in May 2023 when Inmon left Davis, Inmon and MC visited MacKenzie in Fayetteville, but at the end of the visit, Inmon told MacKenzie that she was turning her cell phone off and could be reached only through Couch. After that visit, MacKenzie struggled to reach her mother by phone because

3

Inmon often did not answer, and when she did answer, Couch could be heard in the background telling her to hang up. In order to see her mother and sister, MacKenzie had to visit them at Couch's home even though she was uncomfortable visiting there. Couch made her feel uneasy because he had "been creepy towards [her] in a sexual manner," including slapping her "butt" on more than one occasion and taking photos of her in her swimsuit without her knowledge or permission.

Second, MacKenzie testified to Inmon's two-decades-long dependency on prescription pills—a habit that continued after MC's birth and took a worrying turn once Inmon separated from Davis. MacKenzie testified that when MC was born in April 2020, Inmon was released a few days before MC because MC was held in the hospital for observation for signs of withdrawal from the hydrocodone and nicotine that Inmon used during the pregnancy. The day Inmon was released, MacKenzie drove Inmon home from the hospital, but on the way home they made a stop so that Inmon could buy pills from one of her friends. After MC came home, MacKenzie noticed her mother, who had been loving and involved during MacKenzie's own childhood, acting withdrawn and distant from MC. MacKenzie also often observed Inmon under the influence of prescription pills that made Inmon "very tired" to the point that she would fall asleep on the couch with a cigarette in her hand and burn holes in the couch and blankets.

MacKenzie testified that when Inmon moved in with Couch, Inmon's substance use escalated. Couch had a habit of taking pills and drinking alcohol. Inmon also continued using pills and "picked up a very heavy drinking habit," with the couple consuming "big

4

gallon jugs of Crown" multiple times a week. MacKenzie testified that Couch controlled Inmon's pills and intermingled them with his own medication. She understood that Inmon and Couch were taking more pills than they had both been prescribed because they would run out before the end of the month and purchase pills from friends. MacKenzie also observed physical changes in Inmon that she attributed to signs of overdose, including frequent vomiting and changes in Inmon's pupils.

Even more concerning was that Inmon and Couch were often under the influence when MC was with them. MacKenzie testified that Couch would often drive under the influence with MC in the vehicle, and Inmon was sometimes too intoxicated to care for MC. MacKenzie also related two specific instances of her mother's increasingly inappropriate, risky behavior. On one occasion, MacKenzie received text messages containing disturbing nude photos of Inmon that were sent from Inmon's phone, and when confronted with the photos, her mother could not give MacKenzie a satisfactory explanation. In another incident, MacKenzie was babysitting MC at Couch's home when Inmon and Couch returned home highly intoxicated. Inmon stripped off her clothes in the living room and got down on her hands and knees. MC then got on Inmon's back to ride her like a horse. Couch called MacKenzie into the room to show her what was happening and make jokes about her mother's nude body. MacKenzie said that Inmon apologized the next day and said she had no memory of what happened the night before.

MacKenzie also testified that Inmon and Couch often left MC overnight at the home of Couch's parents, sometimes for three days together, so they could go drinking. According

5

to MacKenzie, MC had spent so much time with Couch's parents that she was confused as to their relationship to her and had begun calling them "Nanny" and "Paw Paw."

MacKenzie testified that Davis, on the other hand, provided a good environment for her sister, and MC seemed comfortable and happy in his home. Although she admitted that Davis used marijuana in the past, MacKenzie testified that he does not use drugs or drink alcohol and had never been abusive to her or her mother. She also testified that while her mother had been more involved in her childhood as a stay-at-home mom, her father was her biggest "cheerleader."

In her testimony, Inmon denied many parts of MacKenzie's testimony, called MacKenzie lying and vindictive, and tried to paint Davis as the problem parent. With regard to her drug and alcohol habits, Inmon testified that she had a stroke in 2014, was on disability as a result of her stroke, and holds prescriptions for hydrocodone, blood-pressure medication, anxiety medication, and sleep medication. Inmon testified that she takes her medications only as prescribed and denied abusing pills or alcohol. Inmon denied or claimed to have no memory of the incidents MacKenzie had recounted of her acting inappropriately while intoxicated.

Inmon, however, admitted to certain parts of MacKenzie's testimony. She admitted that she took her prescription for opioids during her pregnancy with MC and admitted that on the day she was discharged from the hospital, while MC remained behind for observation, she borrowed pills from a friend. She also admitted to borrowing and trading pills with

6

friends on other occasions and admitted that she once passed out with a cigarette in her mouth and burned a blanket.

Inmon likewise admitted to preventing Davis from seeing MC in person and to not accepting Davis's calls for five to six months after she moved in with Couch. She testified that during that time, Davis had contact with MC only on three occasions when she allowed MacKenzie and MC to video call Davis from Couch's home. She also admitted using MacKenzie as a go-between in her disputes with Davis during the separation.

Inmon characterized Davis as controlling and violent. She testified that the only reason she borrowed pills from friends was because Davis controlled her pills and doled them out in exchange for household chores. Inmon testified that Davis's home was not safe for MC because Davis held a medical marijuana card and regularly kept and used marijuana in the home. Additionally, she testified that Davis bred, raised, and sold pit bull dogs on the property, and when she left, Davis had 23 dogs. Although she admitted she herself loved and cared for the dogs, she testified that she did not feel that it was safe for MC to be around so many dogs.

Inmon testified that Davis has a violent temper and would often choke or slap her and had thrown her around and slammed her into things. She testified that once while they were arguing, Davis "slung" a "back scratcher" at her face that caused bruising and bleeding and left a scar. A photograph of Inmon that showed blood coming from her forehead was admitted as an exhibit. She testified MacKenzie was a witness to many of Davis's violent attacks, and Davis once caused MacKenzie to bleed when he hit her on the bridge of her

7

nose with a phone during an argument. Inmon also said that Davis kept guns in the home and had brandished the weapons near Inmon and threatened to shoot her. What is more, Inmon blamed her departure from the marital home on Davis's explosive temper. She testified that a week before she left Davis, he had dragged her down the hall by her hair after she refused him sex. She further testified that she left after Davis "kicked her out" and packed up her belongings.

Inmon, however, had never called the police in response to Davis's violent attacks or sought medical attention for her injuries. She also admitted that during her interviews and visits with the attorney ad litem, she never told the attorney ad litem about Davis's alleged physical abuse or the story that he kicked her out.

As to her new family situation, Inmon testified that she had known Couch and his family since childhood, and she and Couch planned to marry. She described Couch as being loving and a good "daddy" figure to MC. She denied that Couch was ever inappropriate with MacKenzie or MC. She conceded that Couch did slap MacKenzie on the "butt" one time, but she tried to explain it away as a joke that MacKenzie blew out of proportion. She testified that MC and Couch's parents have a loving relationship, and they treated MC like a grandchild. Inmon also asserted that she does not leave MC with Couch's parents as often as MacKenzie had represented.

For his part, much of Davis's testimony was focused upon his plan for how he would care for MC if she was placed in his custody. Davis, who is a full-time truck driver for a lumber yard, testified that he had lived in Scott for 10 years; his mother, JoAnn, lives close

8

by; and his extended family also live in Scott or in nearby North Little Rock. He has a consistent work schedule Monday through Friday from 7:30 a.m. to 4:30 p.m. Davis testified that he planned for his mother to care for MC while he was at work until MC turned four years old, at which point he would enroll her in prekindergarten at his church. When asked about his plan to maintain MC's relationship with Inmon if he was given primary custody, Davis testified that he would help facilitate visitation with Inmon but that he did not approve of MC spending the night at Couch's home.

Davis admitted that he has a 2007 conviction for selling marijuana but testified he had not been arrested since. He testified that he no longer has a medical marijuana card and had not used marijuana in two years and further stated that he does not drink alcohol, smoke, or abuse drugs. He also denied Inmon's stories of physical abuse and denied that his pit bulls are a danger to MC.

Davis testified that Inmon has a long history of using pills and had been abusing pills more frequently in the five years before she left him. He testified that on the night before she left, Inmon was on the couch watching television when she lost consciousness and began foaming at the mouth and throwing up. Davis said that after this, he realized how much Inmon had been buying, trading, and abusing pills. He testified that after MC was born, Inmon was distant and would leave MC in her crib or in a playpen and would sometimes pass out on the couch. His mother, JoAnn, had been very involved in MC's life and would often care for MC when Inmon needed help.

9

Davis denied kicking Inmon out of the marital home and confirmed that after Inmon left, he did not see MC for almost six months. He testified that during this time, he had trouble contacting Inmon by phone because she would either not answer his calls, or Couch would interfere with their conversations. He testified that he was only able to contact MC through MacKenzie until the court ordered visitation.

Davis testified that once he was awarded supervised visitation, his visits with MC were disrupted by Couch's family. Specifically, during the first few months of supervised visitation, MC was brought to visitation by Couch's parents, who tried to film him during visitation and who "hollered," "cussed," and struggled to get MC to end the visits when she cried about leaving Davis. Eventually Inmon and Couch also began attending visitation along with Couch's parents, and the disruptive behavior continued. He also said that Inmon wore sunglasses and slurred her words during those visitations.

JoAnn Davis corroborated Davis's testimony. JoAnn testified that she had been one of MC's primary caregivers for most of the child's life. From the time when MC was around 12 months old, JoAnn noticed that Inmon was sad and tired and began checking in on Inmon and MC around midday each day. Either JoAnn or Inmon would contact each other by phone, and JoAnn would come over to relieve Inmon and take MC to her home for the rest of the day. Often when JoAnn arrived, MC had not been bathed or fed. Usually, Inmon would not invite her inside, but what JoAnn could see of the home was a mess. When she was allowed inside, JoAnn usually found MC standing in her crib or in a playpen in front of

10

the television while Inmon was on her phone or laptop. JoAnn testified that she thought Davis was good with MC, and she was willing and able to help him with MC's care.

At the close of the parties' testimony, the court asked Buffie Merryman, the attorney ad litem, to give her custody recommendation. Merryman stated that she had visited MC in both parents' homes and had found MC to be bright, funny, charming, and talkative. She felt that MC was comfortable with both parents. She was concerned, however, by how Inmon had hastily moved MC out of the marital home to move her in with a new, strange man and his family, and she was concerned by the stories that Inmon and Couch were abusing pills and alcohol. Merryman also felt that Inmon had made efforts to alienate MC from Davis and his family and replace them with Couch and his parents.

Merryman stated that joint custody would not be practical and recommended primary custody in Davis with Inmon having standard visitation. She also recommended no overnight visitation with MC in the home where Inmon cohabited with Couch and that MC not be taken overnight to the homes of people to whom she was not related. When pressed by the judge, Merryman agreed that she had concerns about Couch. She said she thought that he was controlling and that he bullied Inmon. She also stated that in her own phone interviews and visits with Inmon, Couch was always present, and she felt that Couch influenced Inmon's answers and had tried to intimidate Merryman herself. She said that she did not have any allegations or proof before her that Couch had been inappropriate with MC, but she trusted Mackenzie's instincts about Couch.

11

The circuit court then made several rulings from the bench. The court awarded primary custody to Davis, with Inmon granted alternating weekend visitation. Explaining its reasoning, the court stated that despite the preference for joint custody in Arkansas, there was clear and convincing evidence joint custody would not work in this case. As a threshold matter, the court noted MC was approaching school age, and with the parties living over three hours apart, joint custody would not be feasible once MC began prekindergarten. In addition, the parents' contentious relationship since their separation and Inmon's efforts to alienate MC from Davis had proved that joint custody would not work.

The court listed its reasons for not awarding primary custody to Inmon. First, the court noted that Inmon's position was that she should get primary custody based upon her allegations of Davis's domestic abuse, but he found her testimony lacked "any credibility" because Inmon did not raise her abuse allegations until the hearing and, tellingly, did not make the allegations in her divorce pleadings or in her interviews and visits with the attorney ad litem. The court was also very concerned about Inmon's problem with drugs and alcohol and the very serious potential consequences of those habits. Further, the court was not convinced Inmon would facilitate a relationship between MC and Davis if she was granted custody due to her behavior since the parties' separation. Notably, the court called into question Inmon's decision to abruptly relocate MC to Northwest Arkansas so that she could conduct an affair with Sam Couch; her efforts to cut off contact between Davis and MC; and her choice to encourage MC to call Couch "daddy" and treat Couch's parents like grandparents. The court was also concerned that Inmon had established a pattern of passing

12

off her parenting responsibilities to others and was repeating that pattern by frequently leaving MC at the home of Couch's parents overnight and for extended periods of time.

As to Davis, the court noted that placing MC in his custody was also not a perfect choice because Davis has a "bit of a past that will follow him always" and because the court was uncomfortable with Davis keeping 23 pit bulls around a small child. But the judge stated that he was very impressed by the testimony given on Davis's behalf by MacKenzie, "a totally credible" young lady who was in a difficult spot of having to choose between her parents. The court was convinced of MacKenzie's concern for the best interest of her little sister and gave considerable weight to her opinion that Davis should be given primary custody.

The judge closed his remarks from the bench by placing two conditions upon Inmon's visitation privileges—that MC have no contact with Couch and that MC not be left in the care of Couch's family members. The judge expressed his concern that Inmon's choice to cohabitate with Couch was not setting a good example for a small child, but more than that, he was quite concerned by "the other things that come along with Sam Couch."

On April 15, 2024, the circuit court entered the decree of divorce, which restated the court's findings and reasoning for awarding primary custody to Davis. The order stated specifically that "[t]he minor child shall have no contact with Sam Couch," and "[t]he minor child shall not be left in the care of the family members of Sam Couch."

Inmon filed a motion for reconsideration on April 17, 2024, asking that the decree be amended to remove the condition of no contact with Sam Couch because the "no contact" order was improperly issued without a statutory basis under the Arkansas Domestic

13

Abuse Act; Inmon was residing with Couch as his fiancée; and they intended to marry. The circuit court issued a letter ruling on April 19, 2024, stating that the court was denying the motion because the "no contact" provision of the decree was meant to prohibit improper cohabitation. On April 25, 2024, the circuit court entered its order denying the motion for reconsideration. In the order, the court pointed out that the condition prohibiting contact with Couch was meant "to protect the child from exposure to improper cohabitation" and was not a "no contact" order under the Domestic Abuse Act.

Inmon now appeals from the divorce decree and the order denying her motion for reconsideration.

A. Child Custody

Arkansas Code Annotated section 9-13-101(a)(1)(A)(i) (Supp. 2023) provides that, in an action for divorce, the award of custody of a child born of the marriage shall be made without regard to the sex of a parent but solely in accordance with the welfare and best interest of the child. The best interest of the children is the polestar in every child-custody case; all other considerations are secondary. *Styles v. Styles*, 2024 Ark. App. 435, at 21–22, 699 S.W.3d 693, 708. On appeal of custody matters, due deference is given to the circuit court's superior position to judge the credibility of the witnesses. *Id.* Our supreme court has held that there is no other case in which the superior position, ability, and opportunity of the circuit court to observe the parties carries greater weight than one involving the custody of minor children. *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001).

14

As a threshold matter, we note the circuit court found that although joint custody is generally favored in Arkansas, joint custody was not appropriate in this case because the distance between the parties' homes made joint custody impractical and the parties had demonstrated their unwillingness to make joint custody work through their hostility toward each other and inability to cooperate in co-parenting MC. Inmon does not challenge this finding on appeal.

Inmon argues that the circuit court improperly decided not to award her custody as a punishment for her decision to relocate to Northwest Arkansas when she had always been MC's primary caregiver and therefore should have been given priority over Davis.

It is evident from the record that Inmon's relocation to Northwest Arkansas was not the circuit court's sole reason for denying her custody. Although the issue of which parent has been the primary caretaker is relevant and worthy of consideration, it is not in and of itself determinative of custody. *Cunningham v. Cunningham*, 2019 Ark. App. 416, at 6, 588 S.W.3d 38, 42. The circuit court was concerned not just with Inmon's relocation and the resulting distance between the parties' homes but also with the instability in Inmon's life since the separation.

The circuit court found that Inmon had attempted to alienate MC from her father by abruptly moving MC away from her father, grandmother, and extended family in Scott and into the home and family of her new love interest, Sam Couch, while shutting Davis out from any contact with MC. The court also found that Inmon had a pattern of passing the care of MC off onto others, and that since moving in with Couch, she had repeated that

15

pattern by leaving MC in the overnight care of Couch's parents for several days each week. What is more, in light of MacKenzie's testimony and Inmon's own admissions, the circuit court concluded that Inmon had a serious, longstanding substance-abuse problem that had reached a dangerous level since she had moved in with Couch. The court was clearly concerned that Inmon's drug and alcohol habit was a risk to MC's safety and expressed concern about awarding Inmon custody, stating, "I don't want to wake up one morning and read in the newspaper a problem with this little girl . . . I've got . . . one of those sixth sense concerns." Given the record before us and the deference due to the circuit court as fact-finder in custody proceedings, we cannot say the circuit court committed clear error.

Inmon also argues that in awarding Davis primary custody, the circuit court improperly considered certain matters while ignoring other unrebutted proof that living with Davis would not be in MC's best interest. Inmon's arguments are nothing more than a request that we reweigh the evidence and evaluate it differently than did the circuit court. This is something we will not do. *Hamerlinck v. Hamerlinck*, 2022 Ark. App. 89, at 15, 641 S.W.3d 659, 667. Essentially, Inmon recounts the testimony that she deems to have been in her favor and argues that if the circuit court had given that evidence proper weight, it would have ruled in her favor. Specifically, Inmon argues that the circuit court improperly considered the attorney ad litem's recommendation. Inmon also argues that the court ignored her own testimony and the unrebutted testimony of her friend Robin Bradley that Davis is violent and that his home is a dangerous place for MC.

16

Inmon's argument against the circuit court's considering the attorney ad litem's recommendation is a thinly disguised complaint that Inmon was unhappy with the ad litem's recommendation. Inmon now argues that the attorney ad litem's recommendation was hearsay, but Inmon's counsel at the hearing did not object to the attorney ad litem's giving her recommendation before the circuit court; therefore, this argument is not preserved for this court's review on appeal. *Sutton v. Falci*, 2024 Ark. App. 46, at 8, 683 S.W.3d 593, 598. Even so, our supreme court has held that an attorney ad litem's recommendations are admissible in custody proceedings under Arkansas Supreme Court Administrative Order No. 15. *Tracy v. Dennie*, 2012 Ark. 281, at 6–7, 411 S.W.3d 702, 706–07. Moreover, the circuit court, sitting as fact-finder in domestic-relations proceedings, is capable of separating out hearsay and evaluating the evidence. *In re Adoption of K.F.H.*, 311 Ark. 416, 424, 844 S.W.2d 343, 347 (1993).

As to the testimony that Davis is violent, our courts should not take lightly testimony that a parent has a violent temper or that a parent keeps or handles firearms in the home around a young child. But the circuit court was able to observe the parties in the hearing and gave deep and thoughtful consideration to the facts and arguments presented by the parties regarding best interest. The court was clear in its rulings that it did not find Inmon's testimony that Davis is violent and abusive credible because she had belatedly raised the issue for the first time at the hearing, had never reported the alleged abuse to law enforcement or sought medical help, and, most surprisingly, had never mentioned the abuse to MC's attorney ad litem. Moreover, while Bradley's testimony was not addressed in the circuit

17

court's findings, it is worth pointing out that while Bradley testified that she witnessed Davis attempt to incite a fight with another parent at a school event many years before the hearing, she did not testify to witnessing Davis being violent toward either Inmon or their children. Having reviewed the entire record, we are not left with the definite and firm conviction that the circuit court made a mistake in awarding primary custody of MC to Davis. Therefore, we affirm the circuit court's custody decision.

## B. Visitation Limitations on Sam Couch

Inmon also challenges the circuit court's decision to prohibit Sam Couch, her new romantic partner, from being present during her visitation with MC. Inmon argues that the circuit court's ruling was a "no-contact order" issued without a valid statutory basis under the Arkansas Domestic Abuse Act and was based on insufficient evidence and outdated views toward cohabitation.

The main consideration in determining visitation is the best interest of the children, and we will not reverse the circuit court's findings pertaining to visitation unless they are clearly erroneous. *Styles*, 2024 Ark. App. 435, at 25–26, 699 S.W.3d at 710. We do not find clear error in the circuit court's decision and affirm.

Inmon's attempt to cast the divorce decree as a no-contact order is a mischaracterization of the court's ruling. As the circuit court pointed out in its order denying Inmon's motion for reconsideration, the court's ruling that MC should not have contact with Couch is a condition of Inmon's visitation, not a statutory no-contact order under the Domestic Abuse Act. In its rulings from the bench, the circuit court expressed concern not

only about Inmon's cohabitation with Couch setting a poor example for MC but also about whether exposing MC to Inmon's relationship with Couch was beneficial to her well-being. There was testimony at the hearing that Couch was controlling and bullying toward Inmon and that when she was with Couch, Inmon tended to abuse pills and alcohol and engage in other risky and inappropriate behavior. In custody matters, the circuit court has the authority to restrict visitation between a child and a person who is part of their parent's life based upon considerations for the well-being of the child. *Styles*, 2024 Ark. App. 435, at 39, 699 S.W.3d at 717; *see also* Moix *v.* Moix, 2013 Ark. 478, 430 S.W.3d 680.

Inmon argues that the circuit court's decision was based solely upon outdated social views against cohabitation outside of marriage and was a violation of Inmon's and Couch's right to free association under the United States Constitution. Again, we cannot agree.

We need not address the constitutional argument raised in Inmon's brief. Inmon herself admits that she did not raise the argument in the proceedings below, and our courts have held that in custody matters, "if a case can be resolved without reaching a constitutional argument, it is our duty to do so." *Moix*, 2013 Ark. 478, at 9, 430 S.W.3d at 685.

Under the longstanding public policy of the courts in this state, a parent's extramarital cohabitation with a romantic partner in the presence of children or a parent's promiscuous conduct or lifestyle has never been condoned. *See, e.g.*, *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005); *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003); *Campbell v. Campbell*, 336 Ark. 379, 985 S.W.2d 724 (1999). There is no blanket rule that a court must include a non-cohabitation provision in custody and visitation orders any time a

19

parent is involved in extramarital cohabitation with a romantic partner, and the courts have begun to recognize that sometimes modern families no longer fit the traditional mold. *See Moix*, *supra*. But the primary consideration is always the best interest of the child, and "it is a case by case determination, whether it's a bad thing or a good thing in a particular case" to allow a child contact with his or her parent's romantic partner. *Moix*, 2013 Ark. 478, at 10, 430 S.W.3d at 686. "[T]he purpose of non-cohabitation provisions are to promote a stable environment for the children and not merely to monitor a parent's sexual conduct." *Id.* As noted above, the circuit court's restriction on Couch being part of Inmon's visitation was motivated by more than just an interest in maintaining traditional social norms against cohabitation. The testimony in the record evidenced that Couch had been a poor influence on Inmon, and the couple's behavior while MC was in their care was often not in MC's best interest.

Taking a closing shot, Inmon argues that the circuit court's ruling against cohabitation has essentially been nullified because she and Couch married on April 23, 2024, and on that alone, the visitation ruling should be reversed. We cannot reverse on that basis. Nothing in the record before us shows that Inmon made the circuit court aware of the change in her marital status. The only evidence the circuit court had to base its rulings on was Inmon's own testimony at the April 4, 2024 hearing that she and Couch were engaged and intended to marry at some unspecified point in time. While the circuit court's April 25, 2024 order denying the motion for reconsideration was entered two days after Inmon and Couch's alleged wedding date, the circuit court had already issued a letter ruling

on April 19, 2024, stating the court's reasons for denying the motion. And the record does not reflect that Inmon amended her motion for reconsideration to inform the court of her marriage or otherwise notified the court of her change in circumstances. Indeed, there is no proof in the record on appeal that Inmon and Couch are, in fact, married. Inmon and Couch may petition the circuit court for a change in the visitation conditions, but this court cannot grant Inmon that relief. We hold that, on this record, the circuit court did not clearly err in finding that it was in the child's best interest to restrict contact with Couch.

## C. Visitation Limitations on Sam Couch's Family

Inmon argues for her final point on appeal that for all the same reasons the circuit court should not have prohibited MC's contact with Couch, the circuit court also erred in prohibiting Inmon from leaving MC in the care of Couch's family members during her visitation. This argument, too, was not preserved for appeal. Inmon did not object to this condition when the circuit court made its bench rulings during the hearing. Moreover, Inmon filed a motion for reconsideration and amendment of the decree for the sole purpose of challenging the limitation placed on Couch's contact with MC. But Inmon did not raise the limitation concerning Couch's family members either in that motion for reconsideration or otherwise in the record. For this reason, we will not address the argument for the first time on appeal. *Sutton, supra.*

However, we acknowledge that if the issue were appealable, there is evidence in the record to support the circuit court's ruling. Even though there is no evidence that Couch's family members were a danger to MC's well-being, the circuit court was troubled by Inmon's

21

efforts to alienate MC from Davis and her other biological family and replace them with Couch's family. With regard to Couch's parents, Davis testified that when Couch's parents brought MC to his supervised visitation sessions early in the separation, they were disruptive to the visitation. The circuit court was also bothered by Inmon's pattern of passing off her parenting responsibilities to others, and it was evident that Inmon was repeating that pattern by using Couch's parents as frequent overnight caregivers for MC. Therefore, the circuit court's decision to limit which caregivers Inmon can use during her visitation was not clearly in error.

Affirmed.

THYER and WOOD, JJ., agree.

*Tim Cullen*, for appellant.

*Kamps & Griffis PLLC*, by: *Adrienne M. Griffis*, for appellee.