Cite as 2026 Ark. App. 178

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-24-817

| | | |
|---|---|---|
| PATRICK KARLOWSKI | | Opinion Delivered March 11, 2026 |
| | APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72DR-23-1664] |
| V. | | |
| ELIZABETH KARLOWSKI | | HONORABLE STACEY ZIMMERMAN, JUDGE |
| | APPELLEE | AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

## KENNETH S. HIXSON, Judge

Appellant Patrick Karlowski appeals the Washington County Circuit Court's order granting a covenant marriage judicial separation, awarding appellee Elizabeth Karlowski primary custody of the parties' minor child (MC), and setting visitation. On appeal, Patrick argues that (1) the order for primary custody was clearly erroneous; (2) the restrictions on visitation were clearly erroneous; and (3) the one-sided no-contact order was clearly erroneous. We affirm in part and reverse and remand in part.

## I. *Relevant Facts*

The parties were married into a covenant marriage pursuant to Arkansas Code Annotated section 9-11-803 (Repl. 2020) on June 14, 2014. On October 31, 2023, Elizabeth filed her complaint for judicial separation in a covenant marriage pursuant to Arkansas Code Annotated section 9-11-808 (Repl. 2020), generally alleging that Patrick had committed such

general indignities against her as to render her condition intolerable. She alleged that Patrick had unilaterally decided, contrary to her wishes, to separate and was in the process of moving out. Elizabeth asked that she be granted a covenant marriage judicial separation from Patrick; that she be granted primary legal and physical custody of their adopted child, MC, subject to Patrick's reasonable rights of visitation; that Patrick be required to pay child support and spousal support; that the court divide possession of marital property and assign responsibility for marital debts during the separation; that she be granted possession of the parties' marital home; and that Patrick be enjoined from removing her from his employer-provided health insurance. Patrick filed his answer generally denying the allegations and asked that the parties be awarded joint custody of MC and for his attorney's fees and costs.

A temporary hearing on child custody, visitation, and child support was held on December 15, 2023. Elizabeth testified that Patrick desired a separation against her wishes and moved out of the marital home on November 4, 2023. She said that Patrick resented her because she could not bear children. MC began living with the parties on December 21, 2022, and the parties subsequently adopted MC after MC's biological parents' parental rights were terminated. When MC first moved into the home, Elizabeth took care of MC Monday through Friday during the day. Patrick would assist with the nighttime routine, and the parties would share responsibility on the weekends. Once MC began preschool on Tuesdays and Thursdays, MC would stay with family during the day on Mondays and Wednesdays. Elizabeth still took care of MC during the day on Fridays.

Elizabeth acknowledged that Patrick was a "good dad," but she asked that she be awarded primary custody of MC. She testified that after Patrick moved out of the marital home, he created a weekly custody schedule in which MC would change custody every few days to give each party roughly equal time. Elizabeth voiced that she did not think the schedule was in MC's best interest, but she nevertheless accepted the schedule Patrick devised. Elizabeth explained that as a result of the joint-custody schedule, MC had regressed. He reverted to using "baby talk," threw increasingly more tantrums, started chewing his fingers, became aggressive with other children, and had increased confusion (calling every adult female "mom"). Moreover, MC had been experiencing severe separation anxiety whenever Elizabeth was away from him. Elizabeth explained,

> His separation anxiety is something that we've never had to deal with before. And he -- all the time now, if I turn my back to walk down the hallway, he will lay on the floor and cry and ask where I'm going. Um, he gets very upset if he can't see me and I haven't told him what I'm doing. That was something that he has not experienced -- we've not experienced with him before. Even putting him to bed at night and walking out of the room he screams and cries for me to come back in, to sit by him. He -- dropping him off at school has gotten difficult. His teachers have to take him out of my arms, and, even then, it's -- he takes a few moments before he's okay. Um, but his separation anxiety has gotten pretty bad.

Elizabeth said the behavioral changes occurred after Patrick moved out and the parties started the joint-custody arrangement. Therefore, she thought it was in MC's best interest for her to have primary custody.

> I believe that [MC] needs the stability of his home, of his bed at night, of the people that have been around him for the past year. I believe that switching back and forth for him is incredibly difficult and it is having negative effects on him emotionally. And I believe that one steady location for him is the most beneficial thing that can happen for him.

3

During the marriage, Elizabeth and Patrick and Patrick's parents lived in two separate residences located on the same parcel of land. Although Patrick's parents were previously able to help take care of MC, they could no longer do so due to their health issues. Patrick subsequently moved from Springdale, Arkansas, to Pea Ridge, Arkansas, where Brittany Bray (Patrick's alleged girlfriend) lived in the same neighborhood. Elizabeth explained that Patrick admitted to her that he had an "emotional affair" with Ms. Bray. Elizabeth asked that there be no contact between Ms. Bray and MC. She also asked that the court grant her exclusive possession of the marital home and order Patrick to return the gate opener to their automatic gate and to turn over administrative rights to their security cameras on the property. She explained that Patrick had been unwilling to do so after she asked.

Of importance, certified copies of relevant orders from MC's dependency-neglect case and adoption case were admitted into evidence without objection for the court to consider in determining MC's best interest.

Patrick testified that before moving out of the marital home, the parties shared the responsibility of caring for MC. He stated that he would attend doctor appointments if his schedule allowed. Patrick testified that since the parties' separation, he takes care of MC with the assistance of his parents. Other than MC using some baby talk, Patrick denied seeing any of the other behavioral changes Elizabeth mentioned. Patrick admitted that he made the joint-custody schedule and described the schedule to the court that rotated around

4

his work trips. Upon further inquiry, he admitted that the schedule was confusing and requested that the court award him joint custody of MC on an every-other-week basis.

The circuit court filed a temporary order on January 2, 2024. In that order, the circuit court made the following relevant findings:

5. [Elizabeth] has shown by clear and convincing evidence that joint custody is not in the best interest of the parties' minor child. Therefore, while this case is pending, [Elizabeth] is granted primary custody of the parties' minor child, because that is what is in the best interest of the parties' child, subject to the visitation privileges of the [Patrick], which shall be as follows: every Wednesday at his parents' house . . . from 6 p.m. to 8 p.m.; every other weekend from Friday at 5 p.m. to Sunday at 5 p.m. This weekend [Patrick] shall return the minor child to [Elizabeth] at 5 p.m. Saturday, December 16, since he has had the minor child since December 14. [Patrick] shall have Christmas visitation from 8 a.m. on December 26 to 5 p.m. on December 27. If the parties agree for [Patrick] to have extra visitation time, that is fine with the Court.

6. There shall be no contact between the minor child and any of [Patrick's] female friends, unless they are related to him, nor is the minor child to have any contact with any person of romantic interest to either party.

7. . . . [Patrick] shall pay $851.00 per month to [Elizabeth] beginning December, 2023, and he shall continue to cover the child's health insurance premium and one-half of the child care expense. [Patrick] is paid bi-weekly, accordingly, his bi-weekly support payment will be $392.77, beginning December 15, 2023. . . .

9. The parties own a house and acreage . . . [in] Springdale, Arkansas. [Elizabeth] shall have exclusive possession of the said marital home and acreage. No later than December 20, 2023, [Patrick] shall surrender to [Elizabeth], the gate opener and administrative rights to the cameras and security system for the marital home, and [Elizabeth] shall be responsible for any fees related thereto.

This arrangement continued until the final hearing on Elizabeth's complaint was held approximately three months later on March 29, 2024. Elizabeth repeated much of her testimony that she offered at the temporary hearing. She explained that Patrick told her that

5

he no longer wanted to be married to her on October 14, 2023, *which was only eighty days after they had adopted* MC. She explained that he told her that "he wanted a new wife, a new life, and a new family." After their separation, Patrick made the joint-custody schedule that resulted in MC being transferred every few days. Although Elizabeth tried to make suggestions or ask for changes, Patrick refused to make any changes. Elizabeth repeated that MC regressed during that period of time as follows:

> [MC's] tantrums increased. His ~ he would chew his fingers. He was aggressive to other kids. His separation anxiety was through the roof. I couldn't walk down the hallway without telling him where I was going, or take him with me, or he would have a meltdown. He had a hard time ~ he never knew where he was going, so he was constantly asking, um ~ but, yeah, it was a ~ he started baby talking, potty training got harder, he wasn't sleeping well, . . . He started calling a lot of females mom.

Elizabeth testified that after she was awarded temporary primary custody, MC's behavior improved. MC no longer chews his fingers or shows aggression toward other children. His baby talking had also improved. She admitted that he still struggles, but there has been a lot of improvement. Elizabeth explained that she had to take someone with her to custody exchanges because Patrick yelled at her in front of MC at the first exchange after the temporary hearing. Patrick yelled at Elizabeth, "I hope you're happy with what you've done. What the Judge did was illegal. Now I have to appeal. You had no evidence. All you did was lie and cry." Elizabeth said that the exchange left MC confused, and she is no longer comfortable being around Patrick alone.

Elizabeth asked that she continue to have primary custody of MC. She testified that he needs stability, including one common place he could come home. She said that MC still struggles after visitations with Patrick.

> He has a really hard time sleeping. Until the middle of February, it would take four to five nights before he would sleep okay. He, um, he would just cry and cry and scream and call for me, and I would have to sleep on his floor, or I would bring him to bed with me. And then that started to subside and get less frequent about the middle of February. Now we deal with night terrors. That started about two or three weeks ago where I have to wake him up, give him something positive to do. And then sometimes he'll want to come and sleep with me, and sometimes he goes back to his own bed. He also has started chewing his fingernails off at the skin. . . . He also has been -- after he returns, he's pretty aggressive with me, so he will pull my hair, and he will hit me, and he will kick me, and, uh, so those are behaviors that are new as well. Those happen usually the first two days after he's been gone for the weekend.

Elizabeth said that she tries to foster a good relationship between Patrick and MC. She had purchased a gift for MC to give Patrick for Christmas, took him to the park to spend extra time with Patrick, facilitated FaceTime calls, and tells MC that Patrick loves him every night before bedtime. As part of MC's bedtime routine, Elizabeth sings a family bedtime song with MC. The lyrics of the song repeat the name of each family member who loves him. She said that she has continued to include Patrick's name in the song. After MC came back from a visitation with Patrick, MC began singing a different version of the song that said, "Mommy loves you blah."

When asked about visitation, Elizabeth testified that she wanted to keep the current visitation schedule as ordered in the temporary order. She said the order gave Patrick visitation every other weekend and an additional two hours on Wednesday. When asked

whether she thought that was enough time for Patrick to spend with MC, Elizabeth explained that she considered MC's "stability . . . to be the most important" consideration.

Elizabeth testified that Patrick did not return the gate opener or give her administrative rights to the security cameras as ordered in the temporary order. Instead, Patrick had installed additional cameras on the property and moved things on the property even though Elizabeth was given exclusive possession of the property. Elizabeth stated that she felt uncomfortable because Patrick had made comments to her about when she was or was not home. She was concerned that Patrick would continue to monitor her.

Elizabeth explained that Patrick had lost his job at Walmart after the temporary hearing and that she and MC had lost their health insurance for a time as a result. Elizabeth thought MC could benefit from counseling and explained that she had been trying to find a counselor that had availability. Losing insurance and Patrick's removing her access to the health savings account had affected her ability to get MC counseling. When asked whether she thought Patrick was a "good dad," Elizabeth responded, "I think that a good dad puts the interest of his child ahead of his own, and he has shown not to do that, so I'm not sure."

Ashley Dimmit, MC's former foster mother, testified that she had cared for MC from June 2021 through December 2022. MC was five months old when he first moved in with her and her husband. During that time, MC struggled with transitions, including visitations with his biological mother and daycare. Ashley explained that MC struggled sleeping and chewed his fingers. She thought that MC was doing well after he transitioned into Patrick and Elizabeth's care, and she has continued to see MC at least two to three times a month.

8

However, she noticed "a lot of regression" after Patrick left the marital home, including MC's chewing his fingers, using baby talk, and biting his lip. She even noticed a bruise on Elizabeth where MC had bitten her. Ashley thought those behaviors had improved after the temporary hearing when Elizabeth was awarded temporary primary custody.

Ashley testified that MC was a "Garrett's Law baby" and described MC's challenges throughout the dependency-neglect proceedings. MC was underweight, and it took approximately a year before MC lost the "failure-to-thrive" designation. Copies of the relevant documents and orders from the dependency-neglect and adoption case were admitted into evidence.

Jenna Bertuca, MC's maternal aunt, testified that she is a special-education teacher. She has regular contact with MC and is one of MC's Sunday school teachers. Jenna stated that she noticed a change in MC's behavior from November 1 until December 15, 2023 (from the separation until Elizabeth was granted temporary primary custody). During that period of time, MC would no longer share with other children and instead became controlling and hit them. He would become confused and easily angered. Jenna said that those behaviors had improved since Elizabeth was granted temporary primary custody. However, she still notices that MC has separation anxiety when he is away from Elizabeth.

Reverend Diane Solberg testified that she is a pastor at Bentonville Community Church and an ordained elder in the Church of the Nazarene. She said that some of her responsibilities include the preschool that MC attends and that she has been able to observe

MC at drop offs, pick ups, and in the classroom. Reverend Solberg stated that she also knows Elizabeth because they both serve in the Nazarene district as children's pastors.

Regarding MC's behavior, Reverend Solberg testified that MC was a happy child when he first started at the school. However, after the separation and before Elizabeth was granted temporary primary custody, MC "was more aggressive in situations in the classrooms." He "became more dependent on Elizabeth's presence" and would not want her to leave. She said that since Elizabeth had been granted temporary primary custody, MC has been less aggressive, but his separation anxiety still persists.

Robert Bertuca, Elizabeth's father, testified that he works at Walmart as a director over the security technology department. Patrick had worked in an adjacent department, and Robert knew that Patrick was Brittany Bray's direct supervisor. Robert testified that Walmart has a strict antifraternization policy between managers and their direct reports. He was interviewed as part of an internal investigation into the nature of Patrick and Ms. Bray's relationship. Robert explained that Patrick no longer works for Walmart, and Ms. Bray was transferred to a different job.

Robert testified that he helped Elizabeth with trying to prevent Patrick from accessing the security cameras after the temporary order was entered. However, since he "factory reset the entire network," Patrick had tried to regain access and installed additional cameras. On cross-examination, Robert acknowledged that Patrick's parents live in another home on the property and that Elizabeth supplies their internet service. Robert explained that once he recovered access to the cameras, he "found over 55 hours of downloaded video and audio of

Elizabeth from the inside and the outside of the house that Patrick's mother, Carol, had downloaded prior to the transfer of the system."

Shelli Bertuca, Elizabeth's mother, testified that she had noticed the same changes in MC's behavior as already noted by the other witnesses. Shelli had heard MC scream that he wants to stay home when she and Elizabeth try to get him ready for visitation with Patrick. She had never heard Elizabeth say anything derogatory about Patrick in front of MC. When asked whether Patrick is a "good dad" on cross-examination, Shelli responded, "I think he was originally. I think that his choices at this point are not showing that he has [MC's] best interest at heart. . . . There could have been a way to do things better for [MC's] benefit."

Carol Karlowski, Patrick's mother, testified that she lives in a home on the same property as the marital home and had lived there since April 2020. Carol claimed that she had asked Patrick to help install cameras on the property. She admitted downloading video footage, but she explained that she did so because she did not think Elizabeth was feeding her chickens while she was away as requested. She claimed that she needed access to the cameras to monitor the gate and the dogs.

Carol stated that since the temporary hearing, Patrick had been exercising his Wednesday visitation at her house. She had not noticed any unusual behaviors and stated that MC was "always happy to be there." She thinks Patrick is a very good father.

Brittany Bray testified that she lives in Pea Ridge, Arkansas, and that Patrick lives on the other side of her street. Ms. Bray admitted she was in a romantic relationship with Patrick but said that it did not start until January 20, 2024, after Patrick's separation from

Elizabeth. She admitted that before that time, Patrick was her supervisor and friend. Ms. Bray explained that she was present for MC's adoption and that her children had played with MC. She had not seen MC since December 15, 2024; however, she stated that she had seen MC with Patrick after the separation. She did not see any bad behavior and thought MC was a happy child. Ms. Bray denied that her job change had anything to do with Patrick. Instead, she claimed that she had asked to change jobs so that she would have more flexibility to work from home. She thinks Patrick is a good dad on the basis of the interactions she sees with Patrick and MC.

On cross-examination, Ms. Bray testified that she did not think it was strange that Patrick moved to Pea Ridge when he had lived in Springdale and was working at the time in Bentonville. She claimed that she had sent him links to real estate locations in Pea Ridge simply as a friend. Ms. Bray admitted that they both attend the same church and that they had spent the night only once at each other's homes. She further denied that Patrick's termination from Walmart had anything to do with their relationship even though she admitted that there was an investigation. Instead, Patrick told her that he had been terminated because "he refused to give up his . . . personal phone" after Walmart asked to inspect it. Patrick claimed that his phone "had his mother's health information" and "the stuff for the divorce" on it.

Barbara Cardenas testified that she is Patrick's former coworker. She testified that she had seen Patrick with MC at a birthday party. She thought Patrick and MC interacted "[l]ike father and son" and loved each other.

12

Patrick testified and repeated some of his testimony from the temporary hearing regarding his care of MC. He said that he had bonded with MC and that MC has "always been a happy child." He denied moving to Pea Ridge to be closer to Ms. Bray. Instead, he claimed that he wanted to move there "because it is a smaller community like [he] grew up in." Patrick said that he does not have any problems with his visitation with MC on his weekends. He explained that MC enjoys watching the drones delivering packages to his home. However, Patrick stated that because he thought the temporary order prohibited him from having any female friends around MC, MC is left isolated and could not attend any birthday parties during his time. Therefore, Patrick asked for joint custody.

Patrick denied that MC has separation anxiety while MC is with him. Patrick claimed that MC is fine during his time and even asks to stay with him on Wednesday nights. He explained that he asks Elizabeth for more time with MC, but Elizabeth tells him that she wants to follow the court's temporary order. He admitted that he had occasionally been given a few more hours of visitation, but he wanted extra overnight visitation with MC. He responded that Elizabeth struggles with communication when asked whether he thought he and Elizabeth could "communicate well enough about [MC] to do joint custody." Patrick also admitted there had been times he had to miss visitation time on Wednesdays when MC had a cold because he could not expose his mother, who suffers from health issues, to any sicknesses. Patrick stated that he had conversations with Elizabeth about counseling for MC, and Elizabeth had told him that she was looking into it. He claimed that he obtained COBRA insurance for MC and himself two weeks after he was terminated form Walmart,

13

and it was backdated to the day after his termination. He denied any nefarious intent in installing additional cameras for his parents on the property.

Patrick said that he had to separate from Elizabeth because of their communication issues that had been occurring even before the adoption. He said that he had tried to work on their issues and had "hard conversations" with Elizabeth. However, he testified that Elizabeth had told him not to disclose their marital issues to the Arkansas Department of Human Services (DHS) because she did not want them "to do anything to jeopardize the adoption."

On cross-examination, Patrick admitted that he misrepresented his marital situation to DHS before MC's adoption. He also admitted that he told Elizabeth he wanted a separation on October 14, 2023, and admitted to her that he had an emotional affair with Ms. Bray. When Patrick was asked more about his discussions with Elizabeth about obtaining COBRA insurance, he explained that he had messaged her the following when Elizabeth asked whether COBRA was an option: "It probably is an option, but it costs money. I officially don't have any. We will need to apply for ARKids for [MC] since our low income should allow it now." Patrick admitted that he did not know if he had told Elizabeth that he was purchasing COBRA insurance for him and MC, but he thought he had told her after it was "active."

Patrick admitted that he was "still sleeping" with Ms. Bray. When asked whether he thought it was appropriate for MC to be around another woman he was sleeping with while

14

he was still married to Elizabeth, Patrick responded that he did not think it was an issue because he had told Elizabeth that he did not want to be with her anymore.

At the conclusion of the hearing, counsel for the parties made closing arguments. In relevant part, Elizabeth's counsel reiterated the difficulties MC had experienced over his short life, the fact that Elizabeth's witnesses explained the difficulty MC has with transitions, and Elizabeth's belief that MC "needs the stability of one home." Counsel asked the court to "keep the primary custody situation in place that was put into place at the Temporary Order . . . we believe that, all those reasons, the situation that is in place now should continue."

Patrick's counsel asked that Patrick be awarded joint custody. Counsel explained that Elizabeth failed to show any photographs of MC chewing his fingers or evidence of doctor's appointments to support her contention that MC suffers from separation anxiety. He argued that even if the court thought it was a concern, the court could order MC to attend counseling to help alleviate the behaviors. Counsel complained that Elizabeth's goal was to punish Patrick instead of acting in MC's best interest.

On April 19, 2024, the circuit court filed a thirty-four-page order granting a covenant marriage judicial separation, primary custody, visitation, child support, and possession of marital property. It directed that the file be sealed and made other findings. In addition to quoting the relevant statutes and case precedent regarding covenant marriages, the circuit court made very detailed specific findings and outlined much of the history of the case and

15

testimony already summarized above in this opinion. The following findings are particularly

relevant to this appeal.

The circuit court stated that one of the most credible, unbiased, and insightful

witnesses at the trial was Ashley Dimmit, MC's former foster mother. The circuit court

discussed Ashley's testimony and stated the following:

> Ashley Dimmit has known [MC] the longest, as she has known [MC] since he was 5 months old; she has known [MC] 34 months out of [MC's] 39 months on this earth. She testified that [MC] was placed with her family for 18 months, from June 2021 (at age 5 months) until December 2022 (at one week shy of turning 2 years old). Ashley Dimmit attended every Dependency/Neglect hearing for [MC] from June 2021 through December 2022 and also attended the adoption hearing on July 26, 2023.
>
> . . . .
>
> After 18 months with the Dimmits, [MC] was placed with Elizabeth and Patrick in December 2022 the same month he turned two years old and Ashley Dimmit testified that [MC] did well when placed with Elizabeth and Patrick and that [MC] was a happy toddler.
>
> In the time period from the adoption being granted on July 26, 2023 until the time of Patrick leaving the marital residence on November 4, 2023, Ashley Dimmit testified that "[MC] was doing well" based upon her interactions with [MC] during that time, which occurred two or three times a month. When asked whether there were any changes she observed in [MC] after Patrick moved out of the marital home in November 2023, Ashley Dimmit testified: "Yes, there were notable changes, a lot of regression and some of those behaviors that I had, some of them, I had never seen, but definitely others that I would reassure Elizabeth that were probably due to the transition. I've had a lot of training in kids with trauma and transitions and stability changes and with foster care, and it comes with the territory."
>
> Ashley Dimmit testified [regarding the period between the separation and the temporary hearing and Patrick's joint custody plan]: "[MC] has a tendency when he's nervous or things are a little uncomfortable for him, he will chew on his fingers really bad, to the point of sometimes causing marks. He would also bite his lower lip and causes it to be really chapped and irritated. I have noticed a bruise on Elizabeth from him biting, that was one of the new behaviors . . . and he regressed in his speech."

16

Ashley Dimmit testified that in her interactions with [MC] from December 15, 2023 until March 29, 2024, "things have gotten better such as working on potty training again." She testified that [MC] is still working to "overcoming some of the fearful things, like [MC] was really worried if Elizabeth was out of his sight. I've witnessed that myself. Panic would set in. Seems to be he's a little bit more at ease now, not as on edge. . . . Compared to other children I've been around, transition are more difficult for [MC]."

The last time Ashley Dimmit observed [MC] having negative behaviors was during a trip to the Amazeum in February 2024 with [MC], Ashley and her children and Elizabeth. She noticed a lot of big behaviors from [MC] that day. He was really very fearful of Elizabeth being out of his sight and was chewing on his fingers and lip. Since the trip to the Amazeum, the last several times Ashley has seen [MC], things seemed to have gotten a little bit better, with improvement and he was not chewing on his fingers. Ashley saw no negative behaviors from [MC] when she saw him last week and no negative behaviors when she saw [MC] two weeks ago.

Diane Solberg also testified at the trial; her testimony was also very credible and helpful to the Court in determining what is in the best interest of [MC]. . . . Pastor Solberg testified that she had concerns about [MC's] behaviors from November 1, 2023 to December 15, 2023: [MC] was more aggressive in situations in the classroom; since January 2024 to now, [MC's] behaviors "are not as aggressive, but when Elizabeth walks away, he still has some separation from her, he wants her with him, he wants to know where she is, and that still persists."

Since the December 15, 2023 temporary hearing, [MC] is doing better than he was when the 4 days on/3 days off schedule demanded by Patrick was occurring from November 4, 2023 until December 15, 2023. However, [MC] is still having separation issues from Elizabeth. The Court finds by clear and convincing evidence presented at the trial establishes that the reason [MC] does not have separation issues when leaving the company of Patrick is that [MC's] primary attachment is to Elizabeth.

It is uncontroverted that 80 days after the adoption was finalized, Patrick told Elizabeth that he no longer wished to be in a relationship with Elizabeth. Elizabeth testified Patrick's declaration on October 14, 2023 that he wanted a "new wife, a new life, and a new family" and it came as a complete surprise to Elizabeth. She testified that Patrick moved out of the marital home on November 4, 2023. Upon moving out of the marital home Patrick, insisted that [MC] spend 4 days on/3 days off because he testified that such a joint custody arrangement was fair. Elizabeth made requests

17

to Patrick to not use such a schedule as she believed that schedule was not in [MC's] best interest. Patrick did not heed Elizabeth requests and she requested a temporary hearing. At that temporary hearing on Dec 15, 2023 (when this judge granted temporary primary custody to Elizabeth with temporary visits to Patrick every other weekend and Wednesday evenings). The 4 day on/3 day off schedule imposed by Patrick had a horrible effect on [MC] and as a result, this judge stopped that schedule.

. . . .

When Patrick moved out of the marital home and put into place the 4 days on/3 days off with him and the other days with Elizabeth, [MC] reacted with severe adjustment problems: he threw fits, chewed his fingernails to the quick, reverted to speaking baby talk, and regressed in his potty training. These negative behaviors were described in detail in the very credible testimony of Ashley Dimmit, Pastor Solberg, Elizabeth and Aunt Jenna Bartuca.

[MC] went from a chaotic and traumatic first 5 months of life, to a loving stable home with the same primary caregivers (the Dimmit foster family for 18 months), then placed with Elizabeth & Patrick- virtual strangers to [MC]. [MC] met Elizabeth and Patrick in November 2022 and placed with them the next month when he turned 2.

[MC] had been placed with Elizabeth & Patrick for 10 months when on October 14, 2023, Patrick dropped the bombshell on Elizabeth that he wanted a new wife, new life, and new family. Elizabeth testified that Patrick told her he resented that she was infertile. On the stand, Patrick testified that he left the relationship because Elizabeth wouldn't communicate with him about difficult subjects important to him.

Patrick's testimony that he and Elizabeth had been having problems in their marriage "for a while" (before [MC] was placed with them). Patrick testified that he did not disclose the marital problems to DHS before [MC] was placed with them because Elizabeth told him "not to tell DHS." This Court finds that Patrick's testimony is incredulous.

. . . .

Much of Patrick's testimony was incredulous as his demeanor, facial expressions and pomposity showed a lack of truthfulness and sincerity, laced with anger about things (or people) he could not control or people not being "fair to him" (he testified that he tried to appeal Walmart's decision to terminate his employment

18

because "it was not right" even though he was having an ongoing inappropriate affair with Brittany and he was her boss and he knew of the no fraternization policy of Walmart) he continued to show a lack of empathy of what [MC] has been through since birth and what he has put [MC] through.

Patrick, choosing to have [MC] placed with Elizabeth and him, knowingly placed [MC] a child with a known history of trauma and a severe need for stability into a family and home which Patrick already knew he would be leaving (unbeknownst to Elizabeth). Then Patrick continued the omission of not telling DHS of the marital problems despite the 6 months leading up to the adoption finalization-and Patrick went through with the adoption.

When asked whether Patrick "is a good dad?" several witnesses testified that they thought Patrick was a good dad until he started placing his own wishes and desires above the needs of [MC] and that "originally, Patrick was a good dad but with his choices at this point, "no," he is not a good dad are very accurate observations. Although Carol testified that her son Patrick is a good dad, his actions since December 2022 do not show that he is.

The Court finds by clear and convincing evidence that Patrick's actions in going forward with [MC] being placed with him and his wife all the while knowing that he was no longer happy in his marriage and he would be ending that relationship soon show a total lack of acting in [MC's] best interest. Appallingly, Patrick went forward with the adoption and the finalization of the adoption all the while having problems in the marriage (but not telling Elizabeth that the communication problems were so bad he wanted out of the marriage, not telling DHS of the marital problems, and then moving out of the marital home) causing more emotional trauma to [MC].

. . . .

The testimony of Patrick and Brittany is incredulous. Patrick had been Brittany's boss at Walmart for several years. Patrick hadn't sent flowers to his wife with [MC's] name on it, nor had Patrick even sent flowers to co-worker Barbara Cardenas. Much of Brittany's testimony was not truthful. Ms. Bray incredulously testified she did not know of Patrick's plans to leave his wife. Patrick's testimony that he moved to Pea Ridge because he "always wanted to live in a small town like he did when he was a boy" was the reason he chose to rent a house in Pea Ridge and not because Brittany lives right by the rental is unbelievable and ridiculous. The court finds B. Bray's testimony regards her lack of knowing of Patrick's plan to leave his wife and the level of her involvement with Patrick over the last 13 months is incredulous.

19

Patrick could have stayed put on the 15 acres of marital property, move in with his parents or live in one of the out buildings on the property help daily his mother (who has cancer) and father who live right next door to the marital residence and continue to be a daily presence in [MC] life, and not demand that [MC] make the adjustments that no 3 year old with a history of trauma should have to make. However, Patrick chose to not tell DHS that he believed there were problems in his marriage, he chose to go forward with placement of [MC] with him and his wife, went forward with the adoption process and its finalization, while having an inappropriate relationship with his work subordinate and having plains to leave his wife, all the while ignoring [MC's] very important emotional needs.

Patrick still expects that [MC] emotional developmental needs should play second fiddle to Patrick's needs, that Patrick should have [MC] 50% of the time no matter the emotional cost to [MC].

Ten months after being placed in another new home with new people, [MC] once again is to pay the price for the choices of the adults in his life, resulting in [MC] having to deal with more trauma.

Once this court set forth a specific visitation schedule for Patrick on December 15, 2023, Patrick testified that, much to his disgust, Elizabeth wouldn't agree to give him additional overnights with [MC] and that Elizabeth wanted to "follow the court order"; his demeanor on the stand was that he was appalled that Elizabeth would follow the order and not agree to additional overnights.

Elizabeth testified at the very 1st exchange of [MC] after the December 15, 2023 temporary hearing, Patrick yelled at Elizabeth while she was holding [MC]. Yelling "do you know what you are doing? . . . what that the Judge did was illegal. . . ." After that exchange which alarmed and frightened Elizabeth, she brought another person with her at each exchange. Patrick testified it bothered him that Elizabeth brought another person with her for exchanges, yet he created the hostile environment in the first exchange and Elizabeth was taking steps to protect herself and [MC] from Patrick's behavior. These actions of Patrick also show that his parenting time should be limited for the best interest of [MC].

**THIS COURT HAS CONSIDERED JOINT CUSTODY AND ALTHOUGH JOINT CUSTODY IS FAVORED IN ARKANSAS THIS COURT FINDS BY CLEAR AND CONVINCING EVIDENCE THAT JOINT CUSTODY IS NOT IN [MC'S] BEST INTEREST AND THE PRESUMPTION THAT JOINT CUSTODY IS IN [MC'S] BEST INTEREST IS REBUTTED**

The Court finds by clear and convincing evidence that joint custody is not in [MC's] best interest as set forth in these written findings of facts, specific findings and conclusions of law as to this Court's determination as outlined in this lengthy order.

. . . .

It is clear and convincing from the evidence that Patrick and Elizabeth cannot co-parent [MC] together and cannot communicate with each other. For example after Patrick moved out on November 4, 2023, he dictated a joint- custody "shared" schedule (4 days on 3 days off) and would not adjust the schedule at the request of Elizabeth and ignored her valid and serious concerns about the effect of the "shared" time on [MC]; that Patrick yelled at Elizabeth during the 1st exchange while Elizabeth was holding [MC] after this Court found that the shared time schedule Patrick imposed was not in [MC's] best interest; that Patrick doesn't want Elizabeth to bring anyone with her other than [MC] to the exchange (failing to own up to Elizabeth's valid worries about her safety given Patrick's previous behavior), belittling Elizabeth about [MC's] needs because "she doesn't communicate properly" with him. Patrick testified that he left his wife because "she doesn't communicate about things important to me."

From all of the testimony, it appears that as long as Elizabeth goes along with what Patrick dictates, there are not communication problems. The main communication problems the Court sees are Patrick's lack of communication and Patrick having and planning a secret life: Patrick not disclosing his marital issues with DHS, not communicating the truth to his wife about his "work" relationship with Brittany, not communicating with his wife that he was going to file his 2023 tax returns married filing separately, that he received a tax refund and big work bonus, and that he with the help of his girlfriend have listed marital property (the excavator for sale on her face book page). Furthermore, the fact that Patrick sees nothing wrong with having [MC] around Patrick's paramour, while Patrick is still married to Elizabeth, is more evidence that Patrick's actions do not have [MC's] best interest as the number one priority. Additionally, Patrick shows a propensity to ignore terms of court orders. Elizabeth is not in agreement to joint custody for very good reasons.

How can a parent, namely Patrick, properly co-parent on a joint custody schedule if he cannot be truthful and communicate with the other parent in a give and take way to insure that the best interests of 3 year old [MC] (who has an intense history of trauma) are met. Patrick cannot.

**THE COURT FINDS BY CLEAR AND CONVINCING EVIDENCE THAT JOINT CUSTODY IS NOT IN THE BEST INTEREST OF [MC] AND**

**THE COURT GRANTS SOLE CUSTODY OF [MC] TO PLAINTIFF ELIZABETH, WITH VISITATION/FAMILY TIME BETWEEN DEFENDANT PATRICK AND [MC] AS FOLLOWS:**

No overnight visitation.

- Every Tuesday from 3:00pm - 6:00pm, with Patrick picking [MC] up from preschool at 3:00 p.m. and returning [MC] at 6:00 p.m. to the marital home occupied by Elizabeth and [MC].

- Every Saturday from 10:00am - 6:00pm Saturday beginning Saturday April 20, 2024, with Patrick picking [MC] up from the marital home at 10:00 a.m. and returning [MC] to the marital home occupied by Elizabeth at 6:00pm. However, [MC] shall have 2 full weeks in the summer with Elizabeth to take [MC] on vacation or out of town, during which time there shall be no visitation, other than calls or short face time calls, with Patrick.

- Thanksgiving Day (Odd years) 10:00am - 6:00pm

- Christmas Eve (Even numbered years) 10:00 a.m. - 6:00 p.m.

- Father's Day (Every year) 10:00am - 6:00pm

- Memorial Day 10:00am - 6:00pm

- Labor Day 10:00am - 6:00pm

- 4th of July 10:00am - 6:00pm

. . . .

Patrick testified that he installed an additional surveillance camera after he moved out of the marital home because his parents were not able to do so themselves due to his parents' health issues. He did so after this court ordered Patrick to turn over control of the surveillance system to Elizabeth. The testimony is that parents-in-law and Patrick have access to that footage. *It is clear from the testimony that Patrick is able to monitor all of Elizabeth's comings and goings to the marital home. All of the cameras and surveillance that were and are put in place by Patrick and monitored by Patrick are additional ways Patrick is harassing and intimidating Elizabeth.* The testimony shows that Patrick is an expert in computers, surveillance and security and that those areas of knowledge are what his job at Walmart is about. Patrick's ongoing actions since the separation

show that he wants to have power and control over Elizabeth to the detriment of Elizabeth and [MC].

. . . .

[MC] shall have no contact whatsoever with Brittany Bray, or any other woman with whom Patrick is involved in an emotional affair, sexual relationship, or romantic relationship.

(Any emphasis in original.) This appeal followed.

## II. *Standard of Review*

In reviewing domestic-relations cases, this court considers the evidence de novo and will not reverse unless the circuit court's findings are clearly erroneous. *Heileman v. Cahoon*, 2024 Ark. 164, 699 S.W.3d 85; *McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Cooper v. Kalkwarf*, 2017 Ark. 331, 532 S.W.3d 58. It is well settled that the primary consideration is the welfare and best interest of the child, while other considerations are merely secondary. *McNutt, supra.* We give due deference to the superior position of the circuit court to evaluate and judge the credibility of the witnesses in child-custody cases, and this deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Cooper, supra.*

23

III.  *Child Custody*

In a proceeding for a judicial separation in a covenant marriage, a court may award a spouse all incidental relief afforded in a proceeding for divorce, including, but not limited to, spousal support, claims for contributions to education, child custody, visitation rights, child support, injunctive relief, and possession and use of a family residence or joint property.  Ark. Code Ann. § 9-11-809(d) (Repl. 2020).  In an original child-custody determination, there is a rebuttable presumption that joint custody is in the best interest of the child.  Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)* (Supp. 2023).  However, the presumption may be rebutted if the court finds by clear and convincing evidence that joint custody is not in the best interest of the child; if the parties have reached an agreement on all issues related to custody of the child; if one of the parties does not request sole, primary, or joint custody; or if a rebuttable presumption described in subsection (c) or subsection (d) of this section is established by the evidence.  Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(b)*.  While there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child.  *Van Pelt-White v. White*, 2025 Ark. App. 464, 724 S.W.3d 589.  Each child-custody determination ultimately must rest on its own facts.  *Tubbs v. Tubbs*, 2025 Ark. App. 315, 716 S.W.3d 204.

Here, the circuit court specifically found by clear and convincing evidence that Elizabeth rebutted the presumption that joint custody was in MC's best interest and awarded Elizabeth primary custody subject to Patrick's visitation as ordered.  Patrick argues on appeal

that the presumption was not rebutted and that primary custody with Elizabeth was not in MC's best interest. In support, he argues that he is a "good parent," that he had previously shared in the parenting responsibilities before separation, that MC's pre-adoption anxiety does not preclude joint custody, that the primary custody decision was merely punishment for leaving Elizabeth, and that there had been no discord about coparenting. Accordingly, Patrick argues that we must reverse the custody decision and remand for joint custody. He also argues that we should vacate and remand any award of child support and alimony because the circuit court clearly erred in granting Elizabeth primary custody. We disagree.

We cannot say that the circuit court clearly erred in finding that the presumption had been rebutted and that there was clear and convincing evidence that joint custody was not in MC's best interest. In particular, Patrick analogizes this case to *Grimsley v. Drewyor*, 2019 Ark. App. 218, 575 S.W.3d 636, and argues that *Grimsley* is instructive here. However, it is important to note that in *Grimsley* and other cases cited in his brief, we *affirmed* the circuit court's award of joint custody, specifically giving deference to the circuit court to weigh the evidence before it. In *Grimsley*, we acknowledged that most joint-custody situations involve some amount of disagreement and affirmed after stating that Grimsley testified that the parties had raised the children as a team, and she agreed when the parties separated to joint custody with equal time. Those are not the facts here.

The circuit court heard evidence from multiple witnesses that MC had significant and concerning behavioral changes that started after the parties attempted joint custody pending judicial resolution. The circuit court gave considerable weight to the testimony of Ashley,

25

Reverend Solberg, and Jenna confirming the regressive behaviors MC exhibited while the parties shared joint custody and the improvement since Elizabeth had been given temporary primary custody. Although Patrick testified that he did not see any of these concerning behavioral changes, the circuit court specifically found his testimony not credible. In fact, the circuit court specifically noted the following regarding its perception of Patrick's credibility:

> Much of Patrick's testimony was incredulous as his demeanor, facial expressions and pomposity showed a lack of truthfulness and sincerity, laced with anger about things (or people) he could not control or people not being "fair to him[.]" . . . The testimony of Patrick and Brittany is incredulous. Patrick had been Brittany's boss at Walmart for several years. . . . Much of Brittany's testimony was not truthful.

Further, in light of the testimony offered that the circuit court found credible, we cannot agree with Patrick's contention on appeal that MC's anxiety issues were "not caused by joint custody" and were "insubstantial." Accordingly, given our standard of review and the deference we give to the circuit court to evaluate and judge the credibility of the witnesses in child-custody cases, we cannot say that the circuit court's findings were clearly erroneous and affirm on this point.

### III. *Visitation*

Next, Patrick argues that prohibiting him from having any overnight visitation with MC and limiting his visitation time to only eleven hours a week was unreasonably restrictive. The primary consideration regarding visitation is the best interest of the child. *Baber v. Baber*, 2011 Ark. 40, 378 S.W.3d 699. Important factors the court considers in determining

26

reasonable visitation are the wishes of the child, the capacity of the party desiring visitation to supervise and care for the child, problems of transportation and prior conduct in abusing visitation, the work schedule or stability of the parties, and the relationship with siblings and other relatives. *Id.* We will not reverse a circuit court's findings pertaining to visitation unless they are clearly erroneous. *Styles v. Styles*, 2024 Ark. App. 435, 699 S.W.3d 693; *Kinder v. Kinder*, 2022 Ark. App. 476, 655 S.W.3d 880.

Arkansas Code Annotated section 9-13-101(b)(1)(A)(vii)*(a)* states that "a parent who is not granted sole, primary, or joint custody of his or her child is entitled to reasonable parenting time with the child unless the court finds after a hearing that parenting time between the parent and the child would seriously endanger the physical, mental, or emotional health of the child." Here, the circuit court recited this provision in its order and found that a "reasonable amount of parenting time" or "overnight visits" would "seriously endanger the mental and emotional health of [MC]." The circuit court ordered that Patrick was not to have any overnight visitation and granted him the following visitation schedule:

- Every Tuesday from 3:00pm - 6:00pm, with Patrick picking [MC] up from preschool at 3:00 p.m. and returning [MC] at 6:00 p.m. to the marital home occupied by Elizabeth and [MC].

- Every Saturday from 10:00am - 6:00pm Saturday beginning Saturday April 20, 2024, with Patrick picking [MC] up from the marital home at 10:00 a.m. and returning [MC] to the marital home occupied by Elizabeth at 6:00pm. However, [MC] shall have 2 full weeks in the summer with Elizabeth to take [MC] on vacation or out of town, during which time there shall be no visitation, other than calls or short face time calls, with Patrick.

- Thanksgiving Day (Odd years) 10:00am - 6:00pm

- Christmas Eve (Even numbered years) 10:00 a.m. - 6:00 p.m.

- Father's Day (Every year) 10:00am - 6:00pm

- Memorial Day 10:00am - 6:00pm

- Labor Day 10:00am - 6:00pm

- 4th of July 10:00am - 6:00pm

Patrick argues that the circuit court's decision is clearly erroneous because "there is no justifiable basis in this record to deny [him] overnight visitation or more weekend time." He argues that the circuit court's order was designed to "punish him for having an unhappy relationship" and moving closer to Ms. Bray. Although he acknowledges that the circuit court stated that MC's separation anxiety was the basis for the circuit court's ruling, he contends that "justification is nonsense." We disagree.

In its temporary order, the circuit court had awarded Elizabeth temporary primary custody but granted Patrick some overnight visitation every other weekend. Although several witnesses testified that some of MC's concerning behaviors had improved, the circuit court heard evidence that the overnight visitations still caused concerns. Elizabeth testified that Patrick yelled at her in front of MC at the first exchange after the temporary hearing, leaving MC confused and necessitating that she have someone with her at future exchanges. She further explained that MC continued to struggle when he returned from overnight visitations with Patrick:

> He has a really hard time sleeping. Until the middle of February, it would take four to five nights before he would sleep okay. He, um, he would just cry and cry and scream and call for me, and I would have to sleep on his floor, or I would bring him

28

to bed with me. And then that started to subside and get less frequent about the middle of February. Now we deal with night terrors. That started about two or three weeks ago where I have to wake him up, give him something positive to do. And then sometimes he'll want to come and sleep with me, and sometimes he goes back to his own bed. He also has started chewing his fingernails off at the skin. . . . He also has been -- after he returns, he's pretty aggressive with me, so he will pull my hair, and he will hit me, and he will kick me, and, uh, so those are behaviors that are new as well. Those happen usually the first two days after he's been gone for the weekend.

According to Elizabeth, Patrick even took the sweet bedtime song that the parties had taught MC to remind him of all the people who love him and changed the words to disrespect Elizabeth. When asked what she thought was best for MC, Elizabeth stated the following in response: "[MC] needs stability. He needs a routine and a schedule that he can stick to, and he needs one common place to come home to."

Although we acknowledge that the circuit court initially announced from the bench a visitation schedule that included overnight visitation, the circuit court's detailed written order held otherwise. To the extent that the circuit court's bench ruling conflicts with its written order, if at all, the written order controls over the court's oral ruling. *Anderson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 401, 608 S.W.3d 915. Further, a "circuit court's determination of the best interest of a child is not a matter of an amount of recovery prayed for by a party." *Wilson v. Wilson*, 2016 Ark. App. 191, at 9, 487 S.W.3d 420, 426. Given our standard of review and the deference we give to the circuit court to evaluate and judge the credibility of the witnesses in child-custody cases, we cannot say that the circuit court's findings were clearly erroneous and affirm on this point.

IV. *No-Contact Order*

29

Under the unique circumstances of this case in which the parties were granted a judicial separation in a covenant marriage, we note that the parties still retain their marital status until either reconciliation or divorce. Ark. Code Ann. § 9-11-810 (Repl. 2020). Further, in custody matters, we have held that the circuit court has the authority to restrict visitation between a child and a person who is part of their parent's life taking into consideration the well-being of the child. *Inmon v. Davis*, 2025 Ark. App. 494, 24 S.W.3d 657. Under the longstanding public policy of the courts in this state, a parent's extramarital cohabitation with a romantic partner in the presence of children or a parent's promiscuous conduct or lifestyle has never been condoned. *Id.* There is no blanket rule that a court must include a noncohabitation provision in custody and visitation orders any time a parent is involved in extramarital cohabitation with a romantic partner, and the courts have begun to recognize that sometimes modern families no longer fit the traditional mold. *Id.* But the primary consideration is always the best interest of the child, and "it is a case by case determination, whether it's a bad thing or a good thing in a particular case" to allow a child contact with his or her parent's romantic partner. *Moix v. Moix*, 2013 Ark. 478, at 10, 430 S.W.3d 680, 686. "[T]he purpose of non-cohabitation provisions are to promote a stable environment for the children and not merely to monitor a parent's sexual conduct." *Id.*

Patrick argues that the one-sided no-contact order was clearly erroneous. Here, the circuit court's written order stated the following: "[MC] shall have no contact whatsoever with Brittany Bray, or any other woman with whom Patrick is involved in an emotional affair, sexual relationship, or romantic relationship." Patrick argues that the circuit court's

ruling is facially unreasonable and is designed as written to police his sexual morality. Elizabeth concedes error on this point and explains that the provision should have been a mutual provision as it was in the temporary order and initially announced in the circuit court's oral findings; accordingly, we reverse and remand for the circuit court to reconsider any restrictions on contact that MC may be allowed with the parties' romantic partners.

Affirmed in part; reversed and remanded in part.

KLAPPENBACH, C.J., and TUCKER, J., agree.

*Matt Kezhaya* and *Sonia Kezhaya*, for appellant.

*Hood & Stacy*, by: *Curtis D. Clements* and *Craig E. Merutka*, for appellee.

31